## In re SOYBEAN FUTURES LITIGATION.

Civ. A. Nos. 89 C 7009, 90 C 1138.

United States District Court,
N.D. Illinois,
Eastern Division.

June 9, 1995.

Marvin A. Miller, Miller, Faucher, Chertow, Cafferty & Wexler, Chicago, IL, for plaintiff.

Constantine L. Trela, Jr., Sidley & Austin, Chicago, IL, for defendant.

NORGLE, District Judge.

The court adopts Magistrate Judge Pallmeyer's Report & Recommendation. The court grants Defendants' motion for summary judgment (Doc. # 292) on Counts II and III but denies the motion on Count I. Defendants' objections (Doc. # 331) and Plaintiffs' objections (Doc. # 335) are overruled. Plaintiffs' fraud claims under Illinois common law in Count III are dismissed without prejudice so that Plaintiffs may pursue them on an individual basis in state court.

### ORDER

Before the court are Defendants' and Plaintiffs' objections to Magistrate Judge Pallmeyer's Report and Recommendation ("Report"). Pursuant to 28 U.S.C. § 636(b)(1)(B), the court referred the motion for summary judgment to Judge Pallmeyer. Judge Pallmeyer issued a seventy-two page Report recommending that the motion be granted as to Counts II and III, and denied as to Count I.

The court has completely reviewed the Report and arguments of counsel on a *de novo* basis. 28 U.S.C. § 636(b)(1)(C); *United States v. Rodriguez,* 888 F.2d 519, 521 (7th Cir.1989). The Court finds the Report to be thorough, accurate, and the decision proper. The court further finds that the Defendants' objection are without merit. The Plaintiffs have presented evidence sufficient to create a genuine issue of fact on each of the elements of a claim for price manipulation under 7 U.S.C. § 25(a)(1)(D). Those four elements are: (1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price. *Frey v. Commodity Futures Trading Comm'n,* 931 F.2d 1171, 1177–78 (7th Cir.1991).

■ The court also rejects Defendants' attempt to cast Plaintiffs' claim under Count I as one for submission of false reports. As Magistrate Judge Pallmeyer clearly explained in her Report, the Plaintiffs have asserted that as part of their scheme to manipulate prices, Defendants misled regulators about Defendants' processing and export requirements for soybeans. In this manner, Plaintiffs contend Defendants were able to exaggerate the market's demand for "cash soybeans" and, consequently, inflate prices. *See Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir.1971) (recognizing that floating false rumors which affect prices is a common manipulative device).

■ Plaintiffs' contention that they should be able to proceed on the common law fraud claim (Count III) based on a "fraud-on-the-market" theory, without proof of individual reliance, is also without merit. As Defendants accurately indicate, evidence of individual reliance is required to surmount a motion for summary judgment. *Good v. Zenith Elec. Corp.*, 751 F.Supp. 1320, 1323 (N.D.Ill. 1990); *see also Schwartz v. System Software Assoc., Inc.*, 813 F.Supp. 1364, 1368 (N.D.Ill. 1993).

Accordingly, the Court adopts and incorporates Magistrate Judge Pallmeyer's Report and Recommendation and the holdings contained therein pursuant to 28 U.S.C. § 636(b)(1).

1. Plaintiffs originally brought two separate class actions, which were consolidated into a single action involving two subclasses. *See Centurions v. Ferruzzi/McCullough v. Ferruzzi*, Nos. 89 C 7009/90 C 1138 (N.D.Ill. May 18, 1993) (Order of Consolidation ¶ 3). For other reports by this court related to this action, *see also Centurions v. Ferruzzi Trading Int'l, S.p.A.*, 1994 WL 114860, No. 89 C 7009, 1993 U.S. Dist. LEXIS 232 (N.D.Ill. Jan. 7, 1993) (recommending that motion for class certification be denied; adopted by order of Judge Norgle on March 4, 1993); *McCullough v. Ferruzzi Trading Int'l, S.p.A.*, No. 90 C 1138, 1993 U.S. Dist. LEXIS 104 (N.D.Ill. Jan. 4, 1993) (recommending that motion for class certification be denied; adopted by order of Judge Norgle on January 27, 1993); *In re Soybeans Futures Litigation*, Nos. 89 C 7009/90 C 1138, U.S. Dist. LEXIS 18,738 (N.D.Ill. December 27, 1993) (recommending that motion for expansion of subclass definition be granted;

## REPORT AND RECOMMENDATION

PALLMEYER, United States Magistrate Judge.

Plaintiffs, two subclasses of buyers and sellers of soybean futures, have filed a consolidated amended complaint[1] against Ferruzzi Finanziaria, S.p.A. and subsidiaries Ferruzzi Trading U.S.A., Inc., Ferruzzi Trading International, S.A., and Central Soya Company, Inc. Plaintiffs allege that Defendants, collectively referred to as the "Ferruzzi Parties," reaped unlawful gains from the July and August 1989 soybeans futures markets by: (1) manipulating futures prices in violation of Section 9(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a); (2) engaging in "excessive speculation" in violation of Section 4a of the CEA, 7 U.S.C. § 6a; and (3) perpetrating common-law "fraud-on-the-market."[2]

Defendants have moved for summary judgment on all three claims. For the reasons set forth below, the court recommends that Defendants' motion be denied as to Count I because there are unsettled issues of material fact. Defendants' motion should be granted as to Counts II and III, however, because Plaintiffs lack standing and a cognizable cause of action.

### FACTUAL BACKGROUND

Plaintiffs' lawsuit arises from the same set of events that led the Chicago Board of Trade ("CBOT") to issue an emergency order

adopted by order of Judge Norgle on January 26, 1994).

2. Pursuant to 28 U.S.C. §§ 1331, 1337, this court has original jurisdiction over Plaintiffs' first two claims because they arise under federal laws to regulate commerce. *See also* 7 U.S.C. § 25(c) (granting federal courts exclusive jurisdiction over private claims brought under the CEA). The court has supplemental jurisdiction over Plaintiffs' third claim because it is part of the "same case or controversy" as the two federal claims. 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to Plaintiffs' claims occurred in this district. *See also* 7 U.S.C. § 25(c) (private claim under the CEA may be brought in any judicial district where defendant is found, resides or transacts business, or where any act constituting the violation occurs).

on July 11, 1989 directing the Ferruzzi Group to liquidate its holdings in the July 1989 soybean futures market. Although the CBOT's actions and its investigation into this matter are not directly at issue here, the court has found it helpful to rely on documents prepared by the CBOT and the Commodity Futures Trading Commission ("CFTC"), as well as other materials prepared and submitted by the parties in their Local Rule 12(m) and 12(n) statements.[3] Other pertinent factual issues will be discussed in later sections of this report, as appropriate.[4]

### A. Overview of commodity futures market[5]

A futures contract (or "future") is a specialized form of a forward contract, in which the parties agree to the price, quantity, quality, and date of delivery of a particular good in advance of the actual delivery. CHICAGO BOARD OF TRADE, COMMODITY TRADING MANUAL at 2, 4, 369 (7th ed. 1989). The distinguishing feature of the futures contract is that the contract terms are all standardized in order to facilitate the buying and selling of the contracts. *Id.* at 13, 369–70. The only remaining variable is the price, which is determined in an auction-like process by buyers and sellers of the futures who negotiate in organized commodity exchanges. *Id.*

The party selling the future—that is, the party promising to make delivery—is called a "short" and is said to hold a "short open position," whereas the party buying the future—i.e., promising to take delivery—is the "long" and holds a "long open position." *Id.* at 372, 377; *Cargill,* 452 F.2d at 1156–57. The longs and shorts do not interact directly; rather, they buy from (or sell to) the commodity exchange, which acts as a third-party clearinghouse to settle accounts, clear trades, regulate delivery, and ensure that market participants fulfill their contractual commitments. COMMODITY TRADING MANUAL, *supra,* at 15.

A party holding a future must satisfy (or "liquidate") her obligation in one of two ways: (i) she may make an equal and opposite transaction (an "offset") in the futures market prior to the expiration of trading on that contract; or (ii) she may take (or make) delivery of the commodity itself, as specified in the contract.[6] *Id.* at 372, 374; *Cargill,* 452

3. Hereinafter, the court will refer to the "Statement of Uncontested Material Facts in Support of Defendants' Motion for Summary Judgment" as "Defs.' 12(m) Statement" and to supporting evidentiary materials by "D.Ex.—." The court will refer to "Plaintiffs' Statement of Contested Material Facts in Opposition to Defendants' Motion for Summary Judgment (Corrected Copy)" as "Pls.' 12(n) Statement" and to supporting materials by "P.Ex.—." Finally, the court will refer to "Defendants' Reply to Plaintiffs' Statement of Contested Material Facts" as "Defs.' 12(m) Reply" and to attachments by "D.R.Ex.—."

4. At the outset, the court notes that its task in preparing this Report has been complicated by Plaintiffs' frequent inclusion of legal opinions and unsupported or conclusory allegations as purported statements of fact. The court reminds Plaintiff that under this court's Local Rules, facts asserted by a party that are not properly denied by the opposed party are to be deemed admitted. *See* U.S. Dist.Ct.R.N.D.Ill. 12(m), (n). The Seventh Circuit has upheld strict application of Local Rules 12(m) and 12(n). *See Schulz v. Serfilco, Ltd.,* 965 F.2d 516, 519 (7th Cir.1992).

On March 24, 1995, four months after Defendants filed their reply brief on this motion, Plaintiffs filed a motion for leave to file supplemental memorandum and exhibits in opposition to Defendants' motion for summary judgment. Plaintiffs' proposed supplemental memorandum addresses issues relevant only to Count I (price manipulation) and says nothing about the other two counts. In light of this court's conclusion that Defendant's motion should be denied with respect to Count I on the basis of Plaintiffs' prior briefs and evidentiary materials, Plaintiffs' supplemental memorandum will not be considered here.

5. For other descriptions of the futures markets, their history, and pertinent legislation and court decisions, *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 356–69, 102 S.Ct. 1825, 1828–35, 72 L.Ed.2d 182 (1982); *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1155–58 (8th Cir.1971), *cert. denied sub nom., Cargill, Inc. v. Butz,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972); *Volkart Bros., Inc. v. Freeman,* 311 F.2d 52, 54–57 (5th Cir.1962). *See also* Jerry W. Markham, *Manipulation of Commodity Futures Prices—The Unprosecutable Crime,* 8 YALE J. ON REG. 281, 285–357 (1991).

6. "Delivery" in this sense does not mean physical delivery of the commodity but tender of the warehouse receipts, which specify the quantity, quality, and location of the commodity, as pro-

F.2d at 1156; *Volkart Bros.,* 311 F.2d at 55–56. As a practical matter, the majority of futures obligations are offset in the futures market—fewer than one or two percent of all futures transactions are settled through actual delivery of the commodity, according to some sources. *Cargill,* 452 F.2d at 1156 n. 2, 1157; CHICAGO BOARD OF TRADE, EMERGENCY ACTION JULY 1989 SOYBEANS: THE STORY BEHIND THE ACTION (HEREINAFTER "EMERGENCY ACTION") at 8 (1990) (P.Ex. 20).[7]

The reason for this seeming imbalance is that the futures market is not intended to be the place to arrange for physical delivery of the commodity. EMERGENCY ACTION, *supra,* at 8. Delivery takes place in the "cash market," and the physical commodity is often referred to the "cash commodity." COMMODITY TRADING MANUAL at 12–13, 364. The primary purpose of the future market, on the other hand, is to provide a form of insurance against adverse changes in the price of the commodity prior to delivery. *Id.* This practice, called "hedging," requires that the trader take a position in the futures market equal and opposite to the position she expects to take in the cash market. COMMODITY TRADING MANUAL, *supra,* at 14, 89–91. For example, a soybean processor may enter into a contract to deliver a certain quantity of soybean oil to a food producer in six months and at a fixed price. If the soybean processor is worried that prices of his raw material will rise before he delivers on his contract, the processor will purchase an offsetting number of futures contracts, i.e., take a long position or adopt a long hedge. *Id.* at 376. Because prices in the cash and futures markets tend to move in the same direction, an increase in prices for cash soybeans will likely be accompanied by an increase in the price for soybean futures. *Id.* at 13–14. Thus, if prices do rise by the time the soybean oil contract comes due, the processor can sell his futures at a profit in order to offset the cost of procuring his needed supplies of soybeans in the cash market. *Id.* at 90–91. Conversely, a merchant who purchases soybeans to resell at some later date may wish to avoid the risk that prices will fall. The merchant will sell futures, i.e., take a short position or adopt a short hedge, and cover any losses he subsequently suffers in the cash market with the profits he can make by buying the lower-priced futures. *See Volkart Bros.,* 311 F.2d at 54.

Of course, prices do not always move as one anticipates, which is why the market attracts speculators. Speculators assume the risks that hedgers avoid in order to make a profit from unexpected price movements. *Id.* at 15, 109–10, 377. Although hedging is the main purpose of the futures market, hedgers benefit from the presence of speculators in the market. Speculators add liquidity and capital to the futures markets; bridge price gaps between longs and shorts; dampen extreme price movements by assuming risk and adding to demand; and facilitate market entry and exit by increasing trading volume. *Id.; Cargill,* 452 F.2d at 1158.

Because they fulfill such different roles, hedgers and speculators are subject to different rules. In particular, the CFTC, which regulates and monitors the futures markets, limits the size of speculative positions that a party may hold in order to prevent excessive volatility and other problems in the market. Hedgers, on the other hand, can be exempted from these limits, provided they can demonstrate that they are engaged in *bona fide* hedging and agree to liquidate their positions in an orderly and commercially reasonable manner as their futures contracts come due. EMERGENCY ACTION, *supra,* at 5. The CFTC may revoke a hedging exemption when it is being used to camouflage what is actually a speculative position. *Id.*

---

vided in the futures contract. *Cargill,* 452 F.2d at 1157; *Volkart Bros.,* 311 F.2d at 54. A long who receives a warehouse receipt may sell a corresponding future and "retender" the receipt in order to avoid receiving and holding the commodity itself. (Pls.' 12(n) Statement ¶ 3.) The parties indicate that some 80–90% of all deliveries are satisfied by retenders. (*Id.*; Defs.' 12(m) Reply ¶ 3.) A trader who receives a large number of receipts but does not retender them is called a "strong stopper." (Pls.' 12(n) Statement ¶ 3.)

7. Defendants, however, maintain that in the case of agricultural futures, including soybeans, over 40% of the contracts that are still open at the beginning of the delivery month result in actual delivery. (Defs.' 12(m) Reply ¶ 3.)

The CFTC is charged with preventing other market abuses, including artificial manipulation of market prices. More will be said about manipulation in the *Discussion* section below. For now, two forms of manipulation require explanation—the "corner" and the "squeeze." Although these terms lack precise definitions, in general a party is said to "corner" a market when it has a net long position and owns all or substantially all of the deliverable supply of a particular commodity. *See Cargill,* 452 F.2d at 1161–62; *Great Western Food Distributors, Inc. v. Brannan* (hereinafter "*Great Western*"), 201 F.2d 476, 478–79 (7th Cir.), *cert. denied,* 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404 (1953); EMERGENCY ACTION, *supra,* at 10. A "squeeze" is a lesser form of a corner, in which the manipulator has a dominant long position but does not have an actual monopoly of the cash commodity; rather, the cash supply is limited due to drought, unexpectedly heavy demand, or other natural or economic forces that are not necessarily within the manipulator's control. *Cargill,* 452 F.2d at 1161–62; *Frey v. Commodity Futures Trading Comm'n,* 931 F.2d 1171, 1175 (7th Cir.1991). In either case, the manipulator is in a position where he could force the shorts to pay artificially high prices as the delivery date approaches in order to settle their accounts. *Id.* at 1161–62; *Frey,* 931 F.2d at 1175; EMERGENCY ACTION, *supra,* at 10.

### B. The 1988 drought and the 1988–89 soybean markets

In this case, Defendants are accused of pursuing a long manipulative squeeze of the soybeans futures market, as well as trading in excess of the CFTC's speculative limits and engaging in common-law fraud. Although Plaintiffs' claims focus on the July and August 1989 soybean futures contracts, the seeds of this conflict were sown at least a year earlier.

In 1988, the United States experienced its most severe drought in over 50 years, one that sharply reduced its production of soybeans and other agricultural commodities. (Schnittker Aff. ¶¶ 4–6, D.Ex. A.) Compounding this problem were continued high demand for soybeans after the 1988 harvest and persistent weather-related concerns through the first half of 1989. (*Id.* ¶¶ 7–11.) As a result, public and private forecasters predicted that the domestic supply of soybeans—already the lowest in over a decade—would be virtually depleted before the 1989 harvest, which would necessitate the import of soybeans from other nations if the U.S. were to meet its demands. (*Id.* ¶¶ 5, 6.)

Yet America's major foreign sources for soybeans—Brazil and Argentina—were experiencing similar drought concerns in early 1989.[8] Argentina's 1989 soybean harvest was 24% below what it had been in 1988. (*Id.* ¶ 13.) Although the drought ultimately avoided Brazil, that nation's ability to export soybeans was limited by dock strikes and other economic problems that kept its soybean stocks off the market. (*Id.* ¶¶ 12–15.) These events put added pressure on U.S. soybean stocks through the middle of summer 1989 and, consequently, on prices in the cash and futures markets. (*Id.* ¶¶ 15–19.)

### C. The Ferruzzi Parties' strategy

These and other related events were of direct interest to the Ferruzzi Group (or "Ferruzzi"), an affiliated group of companies that by 1989 had become one of the world's largest processors and exporters of soybeans and other grains. (Defendants' Memorandum in Support of Their Motion for Summary Judgment (hereinafter "Defs.' Mem. Supp.") at 5, 7–8.) Defendants represent the Ferruzzi Group's two main components—specifically, Central Soya is one of the Group's agri-industrial companies, and Ferruzzi Trading International ("FTI") and Ferruzzi Trading U.S.A. ("FUSA") are among its international grain merchandising and trading companies. (*Id.* at 7.) Defendant Ferruzzi Finanziaria S.p.A. is the holding company for

---

**8.** The growing season in Argentina and Brazil is, of course, opposite to that in the United States. Thus, while the U.S. typically harvests soybeans from September to November or early December, South American nations harvest their crops from March to May or June. (Schnittker Aff. ¶¶ 3, 12.) In the mid–1980s, the United States accounted for approximately 59% of the world's production of soybeans; Argentina and Brazil together provided approximately a quarter of the remaining supply. (*Id.* ¶ 12; COMMODITY TRADING MANUAL, *supra,* at 203.)

the Group and owns 100% of FUSA and FTI. (Defs.' 12(m) Statement ¶ 9.) Although it does not directly own Central Soya, the results of Central Soya's operations are consolidated into the financial statements of Ferruzzi Finanziaria. (Pls.' 12(n) Statement ¶ 147; Defs.' 12(m) Reply ¶¶ 20, 147.) Each Defendant, then, had a different role to play in the Ferruzzi Group's response to shortages in the soybean market.

*Defendants' version of events.* Not surprisingly, the parties to this action describe the Ferruzzi Group's response to these conditions in very different terms. Defendants insist that forecasts of tight supplies and high prices for soybeans presented real risks that exporters, such as FUSA and FTI, and processors, such as Central Soya, would be unable to obtain the soybean supplies they needed if they did not act early to protect their interests. (Defs.' 12(m) Statement ¶ 15; Defs.' Mem.Supp. at 11.) Central Soya was particularly vulnerable to supply shortages, according to Defendants, because in 1988 and 1989 its business activities were dependent solely on soybean processing, and its processing plants were located in states where the drought hit hardest and soybean stocks are typically the first to be depleted. (Defs.' Mem.Supp. at 8–10, 12–13.)

Accordingly, the Ferruzzi Parties assert that they developed a two-part strategy to meet their legitimate processing and export needs. First, by spring 1988 Central Soya began to bid aggressively for soybeans in both its traditional supply areas and more distant locations in order to ensure that it would continue to have adequate supplies throughout the 1988–89 crop year. (*Id.* at 13–14.) Defendants claim that this plan enabled Central Soya to continue to earn substantial revenues later in the crop year after many of its competitors were forced to curtail their operations due to the lack of supplies. (*Id.*) Defendants also insist that Central Soya's inventory and available supplies continued to be lower than they had been in the past, despite its efforts to purchase soybeans throughout the year. (*Id.* ¶ 20; Defs.' 12(m) Reply ¶¶ 31, 36, 82, 95–98, 102, 105, 119, 129, 157.)

The Ferruzzi Group's senior management approved Central Soya's plans in the fall of 1988. (Defs.' Mem.Sup. at 14.) At approximately the same time, they also allegedly agreed on the second half of their strategy, in which they directed their trading companies—including FUSA and FTI—to establish and maintain long positions in soybean futures to hedge their own anticipated export commitments and Central Soya's unfilled requirements. (*Id.*; Defs.' 12(m) Statement ¶ 13.) The trading companies were also to give Central Soya rights of first and last refusal to purchase from their stocks of cash soybeans and, according to Defendants, they did in fact supply Central Soya with substantial quantities of soybeans in 1989. (*Id.* ¶¶ 18, 19.) Defendants also assert that Ferruzzi's senior management assigned control of Central Soya's hedge to the trading companies, yet FUSA and the other trading companies did not reveal their long positions to Central Soya, nor did Central Soya have any input into the structuring of these positions or any of the trading companies' other activities, other than informing FUSA of its own processing and purchasing activities. (*Id.* ¶¶ 14, 16, 17; Defs.' 12(m) Reply ¶¶ 30, 92, 97, 99–100.)

*Plaintiffs' version.* Plaintiffs dispute Defendants' version of events, arguing instead that the Ferruzzi Parties deliberately took advantage of the shortage of soybeans and their positions in the cash and futures markets in order to manipulate soybean prices to their advantage. Plaintiffs assert that the Ferruzzi Parties had been deliberately purchasing large long positions in the soybean futures markets since 1987—the year before the drought struck. (Pls.' 12(n) Statement ¶ 4.) Rather than offset these transactions, however, Defendants allegedly took the "unusual steps" of standing for delivery of the soybeans on some portions of their long contracts; refusing to retender the warehouse receipts they received (i.e., "strong stopping"); deliberately "rolling forward" the remaining portions of their long positions into later months; and shipping more than 100,000 tons of soybeans (approximately 4 million bushels) out of Chicago in order further to constrict the available cash supply. (*Id.* ¶¶ 4, 107, 108.) In this manner, Defendants alleg-

edly were able to acquire large positions and control in the cash and futures markets through 1988 and 1989. (*Id.* ¶ 6.) Defendants deny all these assertions.

Plaintiffs also allege that Defendants' stated need to hedge against Central Soya's processing requirements was but a ruse to mislead the commodities market and its regulators. Plaintiffs maintain that Central Soya neither wanted nor needed the warehouse receipt soybeans acquired by the Ferruzzi trading companies on its behalf. (Pls.' 12(n) Statement ¶¶ 31, 105, 107, 109.) Plaintiffs also claim that by October 1988, Central Soya was holding 4.4 million bushels of soybeans that it did not need, and in June 1989 entered into an agreement with FUSA to store some 6.7 million bushels of unneeded beans in its warehouses. (*Id.* ¶¶ 36, 95–98.) Plaintiffs argue that these facts indicate not only the size of Defendants' cash holdings but also show that Defendants' "hedge" position far exceeded their actual unfilled needs. Thus, Defendants were not entitled to maintain their hedge exemption and were trading in excess of the speculative limits in the CFTC regulations, according to Plaintiffs.

Similarly, Plaintiffs assert that Defendants misled regulators by overstating their export commitments to the former Soviet Union. It is undisputed that in 1988 the Ferruzzi Parties entered into two contracts to export soybeans to the Soviet Union—an August contract for 250,000 metric tons and a November contract for 200,000 tons. (Defs.' 12(m) Reply ¶ 44.) Defendants reported these and other export contracts to the U.S. Department of Agriculture ("USDA"), which collects and disseminates such information to the agricultural markets. (*Id.* ¶ 45.) In December 1988, however, the Soviet Union canceled the November contract. (*Id.* ¶ 55.) Plaintiffs allege that Defendants never informed the USDA of the cancellation of this contract; rather, they continued to file reports that exaggerated their exports by some 200,000 tons. (Pls.' 12(n) Statement ¶ 56.) The USDA allegedly (and unwittingly) disseminated this false information until at least April 1989. (*Id.* ¶¶ 58–59.) Plaintiffs argue that by misleading regulators—and through them, the market—about their true demand for soybeans, Defendants were able artificially to prop up soybean prices, which would have declined had news of the cancellation been made public. (*Id.* ¶¶ 57, 60.) Such an assertion, if true, may also indicate that the Defendants' long position was not entirely a *bona fide* hedge against the Ferruzzi Group's export needs.

Defendants deny all of these assertions and any implication that their long position was not a *bona fide* hedge against their legitimate processing and export needs. In particular, Defendants deny that their export reports were in any way inaccurate, explaining that the export contracts in question were between the U.S.S.R. and FTI, which is not obligated to inform the USDA of its export activity because it is not a U.S. company. (Defs.' 12(m) Reply ¶¶ 11, 45, 55–57, 59–61.) Defendants further assert that there is no reliable evidence that news of the contracts or their cancellation had or would have had any effect on prices.[9] (*Id.* ¶¶ 40, 57, 60.) Also, Defendants dispute any assertion that Central Soya did not want or need the beans further and insist that Central Soya had no knowledge of or involvement in the Ferruzzi Group's futures trading activities. (Defs.' 12(m) Statement ¶¶ 16, 17; Defs.' 12(m) Reply ¶¶ 30, 31, 36, 92, 95–100, 105, 119, 157.)

### D. *Defendants' position in the May 1989 futures*

Whatever Defendants' original motivations, it is generally undisputed that by May 1989 the Ferruzzi Parties had acquired substantial holdings in both the soybean cash and futures markets. The record indicates that by mid-May 1989, the Ferruzzi Parties held long positions of approximately 16–17 million bushels in May 1989 soybean futures—about 90% of the long open interest—and approximately 13 million bushels in July futures.[10]

9. It is not clear from the parties' briefs or statements of fact when the cancellation of the Ferruzzi's November contract became public knowledge.

10. Defendants dispute these and other estimates of their long position, in part because Plaintiffs have described Defendants' long position in gross terms, rather than net of Defendants' short position. (Defs.' 12(m) Reply ¶¶ 77, 78.) Defen-

(Pls.' 12(n) Statement ¶ 77; Letter from David Kaas, CFTC, to Colm Cronin, FUSA, of 5/16/89, P.Ex. 2; Letter from John Mielke, CFTC, to Colm Cronin, FUSA, of 5/16/89, P.Ex. 60; CFTC Interview Report of 5/15/89, included in P.Ex. 2.) Furthermore, by May 15, Defendants owned at least 14.5 million bushels of cash soybeans in Chicago and Toledo. (CFTC Interview Report of 5/15/89, included in P.Ex. 2.) Defendants contend that their cash holdings from May 4 to July 14 constituted approximately 73% to 92% of the total stocks held in CBOT registered warehouses; Plaintiffs claim this figure was 94% to 100%. (Defs.' 12(m) Reply ¶ 67; Pls.' 12(n) Statement ¶ 67.)

It is also undisputed that by May 1989 the Ferruzzi Parties' holdings had attracted the attention of the CFTC and the CBOT. On or about May 16, 1989, the CFTC informed FUSA that it was concerned by the Ferruzzi Parties' large long position in May futures, which exceeded the available supply of cash soybeans and therefore could have a "substantial impact" on whether the price of May futures became artificial.[11] (Letter from Kaas to Cronin of 5/16/89, *supra.*) Apparently unsatisfied with the Ferruzzi's response and concerned about the orderly liquidation of the May contract, the CFTC sent another letter to FUSA two days later, this time revoking FUSA's hedging exemption and ordering liquidation of its holdings that exceeded the three-million-bushel speculative limit.[12] (Letter from Mielke to Cronin of 5/18/89, *supra.*)

Defendants maintained (and continue to maintain) that their long position was a legitimate hedge against their anticipated processing and export requirements. (Defs.' 12(m) Reply ¶ 69.) They also state that neither the May 16 or May 18 letter had any practical effect because they already had decided to liquidate their May futures position and had made substantial progress in doing so. (Defs.' Mem.Supp. at 18 n. 3, citing Cronin Dep. at 734–35; *see also* Mielke memo to files of 5/24/89 re: May 1989 soybeans, P.Ex. 60.) A senior CBOT official testified that the May contract expired without serious problems (Defs.' Mem.Supp. at 18 n. 3, citing Weisenborn Dep. at 79–80), and the CBOT itself would later report that the May contract was liquidated in an orderly—if not entirely voluntary—manner. (EMERGENCY ACTION, at 9.)

### E. Defendants' position in the July and August 1989 futures

In the eyes of regulators, however, the underlying problem had only been postponed, not resolved. The CBOT explains that rather than liquidating its long position in May futures outright, Ferruzzi exchanged its May futures for July futures, thus transferring its controversial holdings from one delivery month to the next. (*Id.*) Plaintiffs maintain that between May 5 and June 12, Defendants purchased 18 million bushels in July 1989 futures, which, when combined

---

dants assert that when their short positions are included, they held a net long position in July futures of only 7.7 million bushels (when Central Soya's holdings are excluded) or a net short position of 3.2 million bushels (when Central Soya's holdings are included). (*Id.* ¶ 77.) The court notes only that in other manipulation cases, a party's long position is typically given in gross, not net, terms. After all, a party holding 100 million bushels each in cash and futures would have the same net position as a party holding zero bushels in each market.

**11.** The CFTC took pains not to accuse Ferruzzi of price manipulation but cautioned that it would consider an investigation if prices did become artificial. (Letter from Kaas to Cronin of 5/16/89, *supra.*) In the same letter the CFTC expressed concern about the Ferruzzi Parties' position in corn futures, but this issue is not material to Plaintiffs' complaint. (*Id.*)

**12.** In a report written some months after the events in question, the CBOT explained that the CFTC and CBOT viewed the Ferruzzi Group's "unusually large concentration of expiring May futures contracts" with "mounting concern" because they continued to hold onto the contracts while other firms were acquiring cash supplies and liquidating their positions; thus, their position threatened the orderly liquidation of the May contract. (EMERGENCY ACTION, *supra,* at 7.) When coupled with their ownership of a substantial percentage of the deliverable supply, the Ferruzzi's position also could have put them in a position where they could have manipulated prices. *Id.* The CBOT also notes that the CFTC's revocation of FUSA's hedging exemption was not made public at the time. *Id.* at 9.

with their previous accumulation of 13 million bushels, gave Defendants a total of more than 30 million bushels in July futures. (Pls.' 12(n) Statement ¶ 77.) This position, according to the CBOT, was nearly double the position in May futures that the Ferruzzi Group had been ordered to liquidate only a few weeks earlier. (EMERGENCY ACTION, at 9.) Furthermore, Defendants allegedly purchased nearly 15.5 million bushels of August 1989 futures during the same period of time; as a result, Defendants allegedly tripled their cumulative holdings in July and August futures to more than 39 million bushels of soybeans.[13] (Pls.' 12(n) Statement ¶¶ 77, 78.)

Defendants dispute Plaintiff's assertions as unsupported by the record, and they further maintain that they were engaged in *bona fide* hedging against their anticipated needs, as they had informed regulators at the time. (Defs.' 12(m) Reply ¶¶ 77, 78, 82.) The CBOT itself explained that in early June 1989, it was not necessarily worried about the Ferruzzi Group's large cash and futures positions, because such large hedge positions are not uncommon, and there remained eight weeks prior to the expiration of the July contract. (EMERGENCY ACTION, *supra*, at 9.) Also, through meetings and letters during the second half of the month, Central Soya and FUSA sought to reassure the CFTC and CBOT about their anticipated requirements and the legitimacy of FUSA's long hedge position. (*See* Defs.' 12(m) Statement ¶ 82; Memo to files from Glenn Schmeltz, CFTC, of 6/15/89, included in P.Ex. 2; Memo to files from Harold Hild, CBOT, of 6/6/89, included in P.Ex. 11; Letters from Mielke, CFTC, to Lockwood Marine, Central Soya, of 6/19/89 and 6/23/89, P.Ex. 2, D.Ex. 21; Letter from Marine to Mielke of 6/30/89, D.Ex. 20; Letter from Colm Cronin, FUSA, to Wallace Weisenborn, CBOT/BCC, of 6/30/89, included in P.Ex. 11.) Both Central Soya and FUSA also indicated that they would bid aggressively for cash soybeans—Central Soya because it was supposedly having difficulty obtaining sufficient quantities to meet its own needs, and FUSA because it had promised to liquidate its July long position in an orderly manner and on a "bushel for bushel" basis. (*Id.*)

Despite these assurances, the CBOT and CFTC continued to monitor Ferruzzi's activities, particularly their impact on the orderly liquidation of the July 1989 futures market. (Letter from Wallace Weisenborn, Chairman, CBOT/BCC, to Colm Cronin, FUSA, of 6/27/89, P.Ex. 68.) During the month preceding July 11, regulators repeatedly asked the Ferruzzi Group to bid competitively for soybeans and reduce voluntarily its large position in July futures. (EMERGENCY ACTION, at 17–18; GENERAL ACCOUNTING OFFICE, CHICAGO FUTURES MARKET: EMERGENCY ACTION PROCEDURES at 4 (April 1990), P.Ex. 21.) Although Defendants assert that Central Soya was bidding more aggressively for cash soybeans in 1989 than it had in 1988 (Defs.' 12(m) Reply ¶¶ 98, 106), the CBOT apparently found few signs that the Ferruzzi Group seriously intended to liquidate its holdings—rather, the Group's long positions remained virtually unchanged; it had made only minor purchases of cash soybeans; and its cash bids had been substantially below market price. (EMERGENCY ACTION, at 15, 19; Letter from Weisenborn to Agostini of 7/7/89, *supra*.)

Consequently, in a letter dated July 7, 1989, the CBOT informed Ferruzzi of its "extreme concern" regarding its July position and ordered it "to commence *substantial* daily reductions of its position immediately," which the CBOT explained should be of the order of 3 million bushels per day. (*Id.* (emphasis in original).) Although the Committee warned that this was Ferruzzi's "last chance to demonstrate the firm's good faith and to begin to honor its obligations as a member of the Exchange" (*id.*), FUSA officials responded that it would continue to hold its long positions unless it were able to obtain sufficient quantities of cash soybeans. (Letter from Colm Cronin and Edward Varin, FUSA, to Wallace Weisenborn, CBOT, of 7/10/89, included in P.Ex. 11.) FUSA also

---

**13.** Although the 39–million–bushel figure is from Plaintiffs' 12(n) Statement, the figures provided elsewhere in their statement of facts suggest that Defendants' cumulative holdings in July and August futures would have been closer to 46 million bushels (= 18M + 13M + 15.5M bushels, in text).

warned that if the CBOT prevented it from holding its hedge position in July futures, Ferruzzi would use whatever means necessary to recover damages incurred by such action. (*Id.*)

### F. *CFTC's July 11 letter and CBOT's emergency order*

Before the CBOT could respond to the Ferruzzi's letter, the CFTC exercised its own authority on this matter. In a letter dated July 11, 1989 and addressed to Central Soya and copied to FUSA, the CFTC reminded Defendants that their long position in soybeans may be classified as a *bona fide* hedge "only to the extent that it represents *unfilled* anticipated requirements for processing" and "[a]t no time should your long hedging position for unfilled requirements exceed the actual amount of your unfilled anticipated requirements." (Letter from Jean Webb, CFTC, to Lockwood Marine, Central Soya, of 7/11/89, P.Ex. 70, D.Ex. 26; EMERGENCY ACTION, *supra*, at 19.) The CFTC then expressed its concern that the orderly liquidation of the July and August 1989 soybeans futures market was being threatened by the Ferruzzi Group's large cash and futures holdings and the shortage of available soybeans. (*Id.*) Consequently, the CFTC ordered the Ferruzzi Group not to hold any hedge positions in excess of the three-million bushel speculative limit during the last three days of trading on the July and August 1989 contracts. (*Id.*)

Defendants seek to downplay the significance of the CFTC's order, describing it as only a "relatively minor adjustment" to the existing rules on anticipatory hedges.[14] (Defs.' Mem.Supp. at 19.) Defendants also interpret the CFTC's letter to mean that the Commission approved Central Soya's description of its anticipated requirements and acknowledged that the Ferruzzi Group was maintaining an anticipatory hedge of Central Soya's unfilled requirements. (Defs.' 12(m) Statement ¶¶ 26, 27.) Neither assertion appears explicitly in the letter, however. Rather, the CFTC stated only that Central Soya's

data submission met the requirements in the relevant regulations; there was no specific statement as to the accuracy of the data or the legitimacy of Central Soya's stated needs. Furthermore, any attempt to infer that the CFTC "acknowledged" that the Ferruzzi Group was maintaining a hedge position must be viewed in light of the warnings, reminders, and orders that form the major portion of this letter. (*See* Pls.' 12(n) Statement ¶¶ 155–58.)

The CFTC transmitted its order to Defendants the morning of July 11. (EMERGENCY ACTION, *supra*, at 19.) In the afternoon of the same day, the Chicago Board of Trade also elected to take action. (*Id.*) The CBOT issued a rare emergency order, in which it directed any party holding a July futures position in excess of the three-million bushel speculative trading limit to liquidate those positions in an orderly manner. (*Id.* at 3, 20; Memo to the Commission from Division of Trading and Markets, CFTC, of 9/7/89, at 7–13, included in P.Ex. 37.) The CBOT also imposed a specific timetable for liquidation, under which an affected party's long position had to be reduced 20% per day until it reached no more than three million bushels as of July 18 and no more than one million bushels as of July 20. (EMERGENCY ACTION, *supra*, at 3, 20.)

Although the CBOT did not specifically name the Ferruzzi Group in its order, the Group was the only entity affected by the terms of the order. (*Id.* at 3.) The CBOT states that as of July 10, 1989, the Ferruzzi Group's long position in July futures was 22 million bushels, which accounted for 53% of the contract's total open interest and was five times larger than the position held by the market's next largest participant. (*Id.* at 3, 13.) At the same time, the Ferruzzi Group owned over 85% of the deliverable supply of cash soybeans but was making no evident attempt to liquidate or offset its large futures position, according to the CBOT. (*Id.* at 3, 15.) Ferruzzi, however, held that the emergency order was unnecessary and had unnec-

---

14. Under such rules, according to Defendants, a party's hedge position during the last five trading days on a contract may not exceed the party's unfulfilled anticipated requirements for that cash commodity for that month and the next month, as opposed to the twelve-month's requirement that may be hedged prior to the last five trading days. (Defs.' Mem.Supp. at 19.)

essarily disrupted the market. (Transcript of remarks by David Swanson during Ferruzzi press conference of 7/24/89, included in P.Ex. 2.) Ferruzzi also explained that it had received the CBOT's order before it could act on the CFTC's July 11 letter, which forced Ferruzzi to exit the market in a very unusual way, causing heavy losses to the company and to many others. (*Id.*)

This lawsuit was filed in September 1989, approximately two months after the CBOT's emergency order. The CBOT also investigated the matter and ultimately dismissed charges of manipulation and market demoralization against Ferruzzi. (Defs.' Mem.Supp. at 6.) The remaining charges, including excessive speculation and attempted manipulation, were settled prior to a hearing or decision by the CBOT's Board of Directors. (*Id.*)

## DISCUSSION

Defendants have moved for summary judgment on all three of Plaintiffs' claims—unlawful manipulation of the soybean futures market (Count I), excessive speculation (Count II), and common-law fraud (Count III). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A defendant moving for summary judgment must prevail if the plaintiff fails to establish an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden is on the movant to show the absence of a genuine issue of material fact, *id.*, and the court must view all evidence in the light most favorable to non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## Overview of private claims under the Commodity Exchange Act

Two of Plaintiffs' three claims—manipulation and excessive speculation—arise under the Commodity Exchange Act, so the court will address the threshold issue of the availability of private remedies under the CEA. Congress did not address private rights of action when it passed the CEA's predecessor in 1921, nor did Congress make any mention of private remedies in any of the amendments that followed during the next sixty years. Congress' silence did not prevent the courts from recognizing certain implied rights of action under the CEA, however, a position the Supreme Court ultimately affirmed in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).[15]

Less than twelve months after the *Curran* decision, Congress enacted Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25 (1994 supp.), in which Congress authorized certain private rights of action. Section 22 has two major components. Of particular interest to this suit is subsection 22(a), 7 U.S.C. § 25(a), in which Congress enumerated the private remedies available to a plaintiff harmed by a person or corporation that violated the CEA. In subsection 22(b), 7 U.S.C. § 25(b), Congress authorized private parties to bring suit against any contract market, board of trade, or related organization for injuries resulting from that organization's violation of or failure to enforce any regulation or rule arising under the CEA. The range of private remedies provided by Congress was not unlimited, however, an issue that will be taken up later in this Report.

After Section 22 took effect, the Seventh Circuit reexamined the scope of private remedies under the CEA in *American Agricul-*

---

**15.** For relevant decisions of the courts of this circuit, *see, e.g., Deaktor v. L.D. Schreiber & Co.*, 479 F.2d 529, 534 (7th Cir.) (finding implied private right of action to enforce antifraud provisions of the CEA), *rev'd on other grounds sub nom., Chicago Mercantile Exchange v. Deaktor*, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *Case & Co. v. Board of Trade*, 523 F.2d 355, 360 (7th Cir.1975) (characterizing implied private rights of action as "undisputed"); *Hirk v. Agri–Research Council, Inc.*, 561 F.2d 96, 103 (7th Cir.1977) (reaffirming implied right of action found in *Deaktor*); *Smith v. Groover*, 468 F.Supp. 105, 113–15, 117–19 (N.D.Ill.1979) (finding implied right of action against CBOT and individual traders for manipulation and other market abuses); *Stone v. Saxon & Windsor Group Ltd.*, 485 F.Supp. 1212 (N.D.Ill.1980) (finding no implied right of action to enforce options trading ban as provided in the CEA); *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 547 F.Supp. 309, 316 (N.D.Ill.1982) (citing *Curran*).

ture Movement, Inc. v. Board of Trade (hereinafter "American Agriculture"), 977 F.2d 1147 (7th Cir.1992), a case that arose from the same events as the present action. In that case, the plaintiffs—a national association of farmers—sued the Chicago Board of Trade for violating its duty to prevent manipulation of futures prices.[16] Id. at 1152. Relying on Curran and related case law, the plaintiffs argued that Section 5 granted them an implied right of action against the CBOT. The Seventh Circuit held otherwise, finding that Section 22 of the CEA "extinguished" the implied private rights of action that the Supreme Court had previously recognized in Curran. Id. The court's decision rested on the language of Section 22(b), which states that the private rights of action against the exchanges enumerated therein " 'shall be the exclusive remedy available to any person who sustains a lost as a result of' a violation of the CEA or an exchange rule by a contract market or one of its officers or employees." Id. at 1153 (quoting 7 U.S.C. § 25(b)(5), emphasis added). The court concluded that because the plaintiffs had not been injured in the course of trading on the contract market, as required under Section 22(b), their claim had to be dismissed. Id.

American Agriculture did not specifically address Section 22(a) or the availability of private remedies against persons other than the exchanges. Id. at 1152. Nevertheless, the Seventh Circuit's reasoning is relevant to the current action, because the same reference to "exclusive remedies" that guided the court's interpretation of Section 22(b) appears in Section 22(a) as well. Specifically, Section 22(a), like Section 22(b), states that

the private remedies enumerated therein (and in a few other subsections not relevant to this litigation) "shall be the exclusive remedies under this chapter available to any person who sustains loss as a result of any alleged violation of this chapter." 7 U.S.C. § 25(a)(2) (emphasis added). Thus, under American Agriculture, unless Plaintiffs' two claims for violations of the CEA—manipulation and excessive speculation—are cognizable under Section 22(a), 7 U.S.C. § 25(a), they must be dismissed.[17]

▮ The private remedies available under Section 22(a) are as follows. A person (other than an exchange, board of trade, or related organization) may be held liable for actual damages that were caused by its violation of the CEA and that resulted from one of the following four transactions: (i) the plaintiff bought futures from or sold futures to the defendant, where the defendant's "violation [of the CEA] constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract," 7 U.S.C. § 25(a)(1) (emphasis added); (ii) the plaintiff received trading advice from the defendant for a fee; (iii) the plaintiff bought or sold a futures contract through the defendant; or (iv) the plaintiff bought or sold an option or leverage contract or commodity pool interest from or through the defendant. Id. See also Grossman, 706 F.Supp. at 230–31. Clearly, Plaintiffs' claim for unlawful price manipulation (Count I) is among the rights of action authorized in Section 22. See 7 U.S.C. § 25(a)(1)(D). Plaintiffs' second claim for excessive speculation is more problematic, however, so it is to this claim that the court will now turn.

---

**16.** The Ferruzzi Group was not a defendant in that suit.

**17.** The court recognizes that other circuits may disagree with the Seventh Circuit's interpretation of Section 22. In Utesch v. Dittmer, 947 F.2d 321, 325 (8th Cir.1991), cert. denied, 503 U.S. 1006, 112 S.Ct. 1764, 118 L.Ed.2d 425 (1992), the Eighth Circuit continued to rely on Curran when it concluded that the plaintiff could maintain a private right of action for price manipulation under Section 9(b) of the CEA. The Eighth Circuit, however, made no reference to Section 22, let alone discuss the amendment's impacts on the Curran decision. This may not have been an issue for the court, given that price manipulation is prohibited under both Sections

9(b) and 22. See 7 U.S.C. §§ 13(b), 25(a). Given the Seventh Circuit's careful analysis in American Agriculture, as well as consistent interpretations of Section 22's "exclusive remedies" language by district courts in Davis v. Coopers & Lybrand, 787 F.Supp. 787, 794–99 (N.D.Ill.1992) (involving private claim for fraud), In re Conti-Commodity Services, Inc. Securities Lit., 733 F.Supp. 1555, 1567 (N.D.Ill.1990) (involving claim for losses due to improper trading), rev'd on other grounds, 976 F.2d 1104 (7th Cir.1992), and Grossman v. Citrus Associates of New York Cotton Exchange, Inc., 706 F.Supp. 221, 230–31 (S.D.N.Y.1989), the court is confident that American Agriculture is controlling on this question.

## I. *Excessive speculation (Count II)*

In Count II, Plaintiffs allege that the Ferruzzi Parties violated Section 4a of the CEA, 7 U.S.C. § 6a, which prohibits a party from trading in excess of the speculative limits fixed by the CFTC. Defendants argue that Plaintiffs have no standing to bring such a claim under either Section 4a or Section 22. The court agrees and recommends that this claim be dismissed.

As Defendants point out, Section 4a itself does not define excessive speculation or set forth any speculative limits; rather, Congress directed the CFTC to set and enforce limits on the positions a party may hold and the amount of trading it may conduct, with exemptions available for *bona fide* hedging. 7 U.S.C. § 6a(a)-(c). Neither Section 4a nor Section 22 authorize private enforcement of CFTC regulations, nor have the courts been willing to recognize such a claim. *See Davis v. Coopers & Lybrand,* 787 F.Supp. 787, 799 (N.D.Ill.1992) (dismissing claim because "the exclusive private remedy under CEA § 22 does not include a cause of action for violations of CFTC Regulations"); *Khalid Bin Alwaleed Found. v. E.F. Hutton & Co.,* 709 F.Supp. 815, 820 (N.D.Ill.1989) (finding that "Congress did not intend that the rules promulgated by the CFTC should give rise to a private cause of action"). Moreover, Defendants assert that under this set of facts, Plaintiffs' claim of excessive speculation satisfies none of the four "transaction conditions" required to bring a claim under Section 22(a), 7 U.S.C. § 25(a)(1). The only possible condition of relevance is manipulation, *id.* § 25(a)(1)(D), yet if Plaintiffs are arguing that Defendants' alleged violation of the speculative limits caused prices to be manipulated or was part of a manipulative scheme, Plaintiffs are describing two components of the same claim, not bringing two separate claims under the CEA.

Defendants have made some powerful legal arguments, yet Plaintiffs have made no effort to rebut these arguments on their merits. Rather, Plaintiffs rely solely on the "law-of-the-case" doctrine, which holds that a court's decision regarding a rule of law should continue to govern the same issues in subsequent stages of the same litigation in order to promote efficiency and fairness. *See Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816–17, 108 S.Ct. 2166, 2177–78, 100 L.Ed.2d 811 (1988). Plaintiffs assert that this court, having once denied Defendants' motion for judgment on the pleadings on Counts II and III, must continue to recognize these two claims. (*See* Pls.' Mem.Opp. at 45–48.)

While the court fully respects the law-of-the-case doctrine and the purpose it is intended to serve, there are a number of reasons why it does not apply in this case. As Defendants point out, a court's decision constitutes the law of the case only if the court "actually decided" the issue, either expressly or by "necessary implication." *PaineWebber, Inc. v. Farnam,* 870 F.2d 1286, 1291 (7th Cir.1989). If an issue was not decided in actuality or by implication, then the prior ruling does not constitute the law of the case. *Id.* Here, Judge Norgle denied Defendants' motion in a brief three-paragraph order, which addressed only the factual standards of the motion but none of the legal issues raised by Defendants. *See Pruitt v. Ferruzzi Finanziaria,* No. 89 C 7009 (N.D.Ill. August 4, 1994) (Norgle, J.). It is impossible to find, then, that the court ever decided—either explicitly or implicitly—whether Plaintiffs have standing to bring a claim for excessive speculation.

Furthermore, the law of the case is most commonly invoked upon remand from an appellate ruling on a question of law or applied by federal courts to orders issuing from state courts. *Id.* at 1290–91. In matters involving interlocutory orders, such as motions to dismiss, or matters that have not been taken to judgment or determined on appeal, the Seventh Circuit has made clear that the district courts have the discretion to reconsider their decisions at any time. *See Cameo Convalescent Center, Inc. v. Percy,* 800 F.2d 108, 110 (7th Cir.1986); *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1227–28 (7th Cir.1995) (law-of-the-case doctrine "is no more than a presumption, one whose strength varies with the circumstances; it is not a straightjacket"). In *Cameo,* for example, the Seventh Circuit ex-

pressly rejected the plaintiff's argument that the district court's earlier refusal to dismiss the case precluded the court from later granting summary judgment against plaintiff. *Id.* Although the *Cameo* decision was motivated in part by a change in the law, the principle enunciated by the court has merit in this case, where the parties are still engaged in the pre-trial stages of litigation.

Finally, the law-of-the-case doctrine expresses only a general practice of the courts not to reopen decisions, but it is not a limit to their power, especially when the circumstances justify it. *See Christianson,* 486 U.S. at 817, 108 S.Ct. at 2178. Here, this court has had the opportunity to analyze thoroughly the question of Plaintiffs' standing and rights of action under the CEA, and concluded that summary judgment should be granted on this claim. The court's recommendation rests in large part on the Seventh Circuit's decision in *American Agriculture,* 977 F.2d at 1152–53. By revisiting an earlier conclusion that the Seventh Circuit likely would have overturned on appeal, the court believes it is serving the broader goals of the law-of-the-case doctrine to promote "finality and efficiency of the judicial process." *See Christianson,* 486 U.S. at 816, 108 S.Ct. at 2177.

Plaintiffs respond that if this court were to "improperly revisit[ ]" its standing to bring a claim for excessive speculation, then the court should reconsider the arguments they had advanced in their earlier Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings Against Counts II and III. Plaintiffs' arguments do not require a great deal of discussion. In their earlier brief, Plaintiffs relied primarily on the implied rights of action recognized in *Curran,* but, as explained earlier, the Seventh Circuit has made clear that Section 22 "extinguished" such implied private remedies. *See American Agriculture Movement,* 977 F.2d at 1152. Other cases cited by Plaintiffs in their earlier brief involved claims that had arisen before enactment of Section 22; thus, these cases are inapplicable in light of the Seventh Circuit's later decision in *American Agriculture.* Finally, to the extent that Plaintiffs argue that excessive spec-

ulation should be recognized as a form of price manipulation, Count II should be merged with Count I and not continue as a separate claim.

In the light of the foregoing, there is no need to visit Defendants' arguments that they were engaged in *bona fide* hedging and not excessive speculation. Defendants' motion for summary judgment on Count II should be granted and the claim dismissed.

## II. *Price manipulation (Count I)*

In contrast to their claim for excessive speculation, Plaintiffs' second claim under the CEA—price manipulation—is expressly included among the transactions that can give rise to a private right of action under Section 22. *See* 7 U.S.C. § 25(a). Rather than challenge Plaintiffs' standing on this claim, Defendants argue that Plaintiffs cannot establish certain factual elements essential to the success of their claim, and on this basis have moved for summary judgment on Count I.

The court recognizes that manipulation cases generally have not fared well with either the CFTC or the courts. *See In re Abrams,* 1992–94 Comm.Fut.L.Rep. (CCH) ¶ 26,237 at 42,041 (CFTC Sept. 15, 1994) (citing cases); Jerry W. Markham, *Manipulation of Commodity Futures Prices—The Unprosecutable Crime,* 8 YALE J. ON REG. 281, 356–58 (1991). Nonetheless, Defendants bear a heavy burden on this motion. At a minimum, of course, Defendants must show there are no genuine issues of material fact and they are entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). Yet Defendants' task is made more difficult by the fact that there is a "dearth of settled caselaw" on price manipulation; as a result, the courts and the CFTC are still struggling to define the basic elements of the claim and to differentiate between fair means and foul in futures trading. *Abrams, supra,* at 42,041 n. 39 (quotes omitted). Markham, *supra,* at 282–85, 352–58. In other words, Defendants must contend not only with complex factual and legal issues but also with the absence of "fixed standards or tests," *Utesch,* 947 F.2d at 327, which complicates the application of any principles or precedents that may seemingly appear in earlier manipulation cases.

One of the reasons for the Defendants'—and the court's—difficulty is that "manipulation" is not defined anywhere in the CEA, despite the fact that the CEA subjects price manipulation to both private and administrative enforcement. Section 22(a) simply states, without further explanation, that a party may recover damages resulting from trading futures with the defendant if the defendant manipulated the price of the futures contract or the underlying commodity. 7 U.S.C. § 25(a)(1)(D). Similarly, Section 9(a)(2) (formerly Section 9(b)) of the CEA states, again without definition, that it is a felony—

> to manipulate or attempt to manipulate the price of any commodity [in the cash or futures markets], or to corner or attempt to corner any such commodity or knowingly deliver or cause to be delivered ... false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce....

7 U.S.C. § 13(a)(2) (emphasis added).

Congress' decision to prohibit manipulation without defining it apparently arose from the concern that clever manipulators would be able to evade any legislated list of proscribed actions or elements of such a claim. *See* Markham, *supra,* at 360. Thus, the task of defining manipulation and its elements has fallen to the CFTC and the courts, yet they generally agree that manipulation defies easy description. As a result, manipulation cases tend to be characterized by fact-specific, case-by-case analysis. *See, e.g., Frey v.*

*Commodity Futures Trading Comm'n,* 931 F.2d 1171, 1175 (7th Cir.1991) (opining that the "'know it when you see it' test may appear most useful" in manipulation cases); *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1163 (8th Cir.1971) (explaining that the test of manipulation "must largely be a practical one" because the "methods and techniques of manipulation are limited only by the ingenuity of man"); *cert. denied sub nom., Cargill, Inc. v. Butz,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972); *In re Indiana Farm Bureau Cooperative Assoc., Inc.* (hereinafter *"Indiana Farm Bureau"*), [1982–84 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,-796 at 27,281 (CFTC Dec. 17, 1982) (task of defining manipulation or attempted manipulation "has fallen to case-by-case judicial development").

Nonetheless, there are some common elements that run through manipulation cases, among them being a general definition that manipulation is intentional conduct that has "resulted in a price which does not reflect basic forces of supply and demand." *Cargill,* 452 F.2d at 1163. Similarly, the Seventh Circuit has defined manipulation as "an intentional exaction of a price determined by forces other than supply and demand," *Frey,* 931 F.2d at 1175, or "the creation of an artificial price by planned action, whether by one man or a group of men," *General Foods Corp. v. Brannan,* 170 F.2d 220, 231 (7th Cir.1948), quoted in *Indiana Farm Bureau, supra,* at 27,281 and *Cargill,* 452 F.2d at 1163.[18]

---

18. Other cases offer similar, if somewhat more verbose, definitions of manipulation. *See, e.g., United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940) ("Market manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone."); *Volkart Bros., Inc. v. Freeman,* 311 F.2d 52, 58 (5th Cir.1962) ("Manipulation is any and every operation of transaction or practice ... calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets. If a firm is engaged in manipulation it will be found using devices by which the prices of contracts for some one month in some one market may be higher than they would be if only the forces of supply and demand were operative.... Any and every operation, transaction (or) device, employed to produce these abnormalities of price relationship in the futures markets, is manipulation. [But] [c]ertainly the term 'manipulate' means more than the charging of what some may consider to be unreasonably high prices."); *In re Hohenberg Bros. Co.,* [1977–80 Transfer Binder] Comm. Fut.L.Rep. ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977) ("A finding of manipulation in violation of the Act requires a finding that the party engaged in conduct with the intention of affecting the market price of a commodity (as determined by the forces of supply and demand) and as a result of such conduct or course of action an artificial price was created.")

▇ In addition, the courts and the CFTC generally have adopted a practical, four-part test for manipulation, in which the accuser must show that: (1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price. *Frey*, 931 F.2d at 1177–78; *In re Cox*, [1986–87 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 23,786 at 34,063 (CFTC July 15, 1987). *See also Great Western*, 201 F.2d at 480. This framework is occasionally modified to fit the specific facts of a particular case,[19] and there is some question to what extent these elements should be treated as separate and independent or whether they are factually and legally interdependent.[20] Nevertheless, this framework is the one adopted by the parties and, given its widespread application, it will be adopted by this court as well.

▇ Having agreed on a framework, Defendants proceed to argue that Plaintiffs cannot establish any of the first three elements—ability to influence prices, existence of artificial prices, or causation—against the Ferruzzi Parties collectively, nor can Plaintiffs establish the final element—intent— against Central Soya individually. The court disagrees, however, finding that there are genuine issues of material fact with respect to each element such that Defendants' motion on Count I should be denied.

## A. *Ability to influence prices*

Defendants' motion raises questions of both law and fact regarding the first element of Plaintiffs' manipulation claim. Not only do the parties dispute whether Plaintiffs can show that Defendants had the ability to influence the prices of the July and August 1989 soybean futures, they also disagree over what test Plaintiffs must employ to establish this element.

### 1. *Question of law: Plaintiffs' "Manipulation-by-false-reports" theory*

Defendants argue that to show that the Ferruzzi Parties were able to manipulate the prices of the July and August 1989 soybean futures, Plaintiffs must show that Defendants controlled the shorts' ability to meet their contractual obligations. As explained earlier, the shorts have only two options to meet their obligations—they must either deliver the cash commodity itself or purchase an offsetting number of futures. Thus, under Defendants' theory, Plaintiffs must show that the Ferruzzi Parties controlled *both* the cash and futures markets in order to show that they could influence futures prices.

Defendants draw their theory from several prominent cases of alleged manipulation by holders of long positions. In *Cargill*, 452 F.2d at 1164–65, the court concluded that the defendant had the ability to influence wheat prices because it owned "practically all" of the deliverable supply of cash wheat and 62% of the futures open interest; thus, it effectively controlled both of the shorts' options. By contrast, in *Frey*, 931 F.2d at 1177, and *Cox, supra,* at 34,062, fact-finders concluded that the defendants lacked the ability to in-

---

**19.** For example, in a classic case involving a long manipulative squeeze, the courts held that the accuser must show a dominant long position; insufficient cash supply; existence and causation of an artificial price; and intent. *Cargill*, 452 F.2d at 1163–1172.

**20.** For example, in *Indiana Farm Bureau, supra,* at 27,287, the CFTC explained that the *intent* to create an artificial price can be inferred from the manipulator's conduct to influence prices (*causation*) or his decision to purchase long contracts in excess of known supply (*ability*). *See also Hohenberg Bros., supra,* at 21,477 (intent may be inferred from a person's actions and the totality of the circumstances). The CFTC has also suggested that the *existence* of an artificial price may

be determined from the legitimacy of the forces of supply and demand acting upon it (*causation* and/or *intent*). *Indiana Farm Bureau, supra,* at 27,288 n. 2 ("when a price is affected by a factor that is not legitimate, the resulting price is necessarily artificial").

Other cases tend to treat these elements as separate and distinct. *See, e.g., Cargill,* 452 F.2d at 1167 (even if the defendant had the ability to influence prices, it cannot be found guilty of manipulation if it did not actually cause artificial prices); *Cox, supra,* at 34,066 (once it is shown the defendants had the ability to influence prices and that prices were in fact artificial, then it must be shown that they caused them to be artificial).

**1046**

fluence wheat prices because they did not control the deliverable cash supply.[21]

Defendants' interpretation of these cases is essentially correct, but the test they propose is too narrow to fit this set of facts. *Cargill, Frey, Cox,* and other prominent cases of manipulation focused on the alleged manipulator's market power, that is, his ability to influence prices by controlling the futures and cash markets. While this kind of alleged long manipulative squeeze forms the backbone of Plaintiffs' claim as well, Plaintiffs also raise an issue that was not present in any of these other cases. Plaintiffs assert that Defendants were able to inflate prices by misleading regulators about their processing and export requirements, thus exaggerating the market's demand for cash soybeans and thereby artificially inflating prices. Defendants' alleged misrepresentations become even more significant in light of the fact that their misconduct allegedly spanned a period of several weeks or months, whereas in *Cox, Frey, Indiana Farm Bureau,* and *Cargill,* the defendants' alleged manipulative conduct occurred only on the last day or days of trading. Given the fact that manipulation claims tend to be ad hoc and fact-specific, as explained earlier, this court should adopt a more flexible test of Defendants' ability to manipulate prices than that which would be suggested by reading *Cargill, Cox, Frey,* or other cases in isolation.

■ Defendants scoff at Plaintiffs' theory of "manipulation-by-false reports," asserting that "[n]either the CFTC nor the courts have recognized such a hybrid claim." (Defs.' Reply at 8–11.) Defendants are correct in pointing out that neither Section 9(b) nor Section 22(a) of the CEA provides a private right of action for the filing of false market information, nor have the courts in this district been willing to recognize private claims for violations of CFTC regulations. *See* 7 U.S.C. §§ 13(b), 25(a); *Davis,* 787 F.Supp. at 799; *Khalid Bin Alwaleed Found.,* 709 F.Supp. at 820. Yet this is not the substance of Plaintiffs' claim. Plaintiffs are not suing Defendants for false reporting *per se;* rather, they are asserting that the false reports played a part in Defendants' alleged manipulative scheme.

There is some precedent for finding that disinformation can affect prices and thus form part of a manipulative scheme. Congress recognized that false rumors may affect commodity prices when it drafted Section 9(b), in which it prohibited not only price manipulation but also dissemination of "false or misleading or knowingly inaccurate reports concerning crop or market information or conditions *that affect or tend to affect the price of any commodity* in interstate commerce. . . ." *Id.* § 13(b) (emphasis added). As noted above, Section 9(b) does not authorize a private right of action, but its construction lends credence to Plaintiffs' theory that false information can create or contribute to the ability to influence market prices.

Courts have reached a similar conclusion. For example, in *Cargill,* 452 F.2d at 1163, the Eighth Circuit referred to "the floating of false rumors which affect futures prices" as "one of the most common manipulative devices." Similarly, in *General Foods,* 170 F.2d at 224, the Seventh Circuit observed in *dicta* that "deceit [and] trickery through the spreading of false rumors" and other forms of fraud are among "the common criteria usual in manipulation or corner cases." Also, in *Moore v. Brannan,* 191 F.2d 775 (D.C.Cir. 1951), *aff'g In re Moore,* 9 Agric.Dec. 1299 (1950), *cert. denied,* 342 U.S. 860, 72 S.Ct. 88, 96 L.Ed. 647 (1951), the D.C. Circuit affirmed a finding by the Secretary of Agriculture that the defendant had "knowingly made false reports concerning market information" as part of a scheme to manipulate the price of lard. In *United Egg Producers v. Bauer Int'l Corp.,* 311 F.Supp. 1375, 1380–83 (S.D.N.Y.1970), a district court found that the defendant had knowingly disseminated false information regarding imports of fresh eggs from Spain in order to inflate estimates of the available supply of cash eggs and thereby drive down prices. Although none of these cases involved a private claim under Section 22(a), the courts' discussions of the effect of false reports on market prices are illuminating.

21. *Cox* and *Frey* arose from the same set of facts.

There is also a collection of old administrative actions by the U.S. Department of Agriculture involving allegations of manipulation by dissemination of false information. For example, in *In re Winn & Lovett Grocery Co.*, 14 Agric.Dec. 561, 562 (1955), and *In re Butler*, 14 Agric.Dec. 429, 430–33 (1955), the defendants disseminated false information in order to manipulate the prices of potatoes and soybeans, respectively. In *In re McGuigan*, 5 Agric.Dec. 249, 250 (1946), the defendant disseminated advice on futures transactions in order to encourage traders to pursue one course of action, while secretly taking opposite positions in order to profit from the market movements he had induced. *In re Moore, supra,* involves one of the more bizarre cases of manipulation-by-false-information, in which the defendant attempted to manipulate the price of lard by distributing a false memorandum to the President of the United States, signed by officials in the State Department and USDA, that stated that the government was about to undertake heavy purchases of lard for export. Finally, a scholar who has analyzed manipulation claims under the CEA noted that disinformation—such as false rumors of Iraqi troop movements during the Persian Gulf War, cancer threats, drought scares, Presidential deaths, and false economic announcements—has been among the many forms that manipulation can take, and consequently recommended that the CFTC exercise closer supervision over such false reports and rumors in order to curb manipulation. Markham, *supra,* at 283, 285, 373.

Finally, in at least two other administrative decisions, the fact-finders rejected Defendants' theory that manipulation requires market control. In *In re Hohenberg Bros., supra,* at 21,477, the CFTC, quoting *Cargill,* wrote that "a dominant or controlling position in the market is not a requisite element to either manipulation or attempted manipulation and is not essential to altering successfully the forces of supply and demand." Similarly, in *In re Henner,* 30 Agric.Dec. 1151, 1232–39, 1280–87 (1971), the USDA explained at length that control of the relevant cash market is not a necessary element of manipulation, and found that the defendant had attempted to manipulate prices even though he was not in a position to squeeze or corner the market. Although these cases did not involve allegations of false reports, they do underscore the flexibility inherent in manipulation claims.

The court recognizes Defendants' objections that none of these cases carries strong precedential weight. The discussion of false reports in *Cargill* and *General Foods,* for example, was mere *dicta,* whereas the administrative actions mentioned above are decades-old and involved consent decrees (*Winn & Lovett Grocery, McGuigan*) or judgments entered after the defendants had failed to respond (*Butler*). In other words, none of these cases reached the merits of the allegations that the defendants had manipulated prices by disseminating false information.

Yet Defendants argue here that false reports cannot form the basis of a manipulation as a matter of law. It is this position that the court cannot accept in light of the cases mentioned above. Also, a careful reading of these and other manipulation claims shows that the Ferruzzi Parties' alleged manipulation of the market through a combination of market power and false reports represents a unique fact pattern that sets it apart from other manipulative schemes. This court concludes that it would be premature to reject Plaintiff's theory that false reports can influence prices and constitute part of a manipulation claim under Section 22(a), 7 U.S.C. § 25(a).

### 2. *Question of fact: Evidence of Defendants' ability to influence prices*

Having accepted for now Plaintiffs' theory that Defendants could have manipulated prices through a combination of false reports and market power, the question arises whether Plaintiffs have alleged sufficient facts to withstand Defendants' motion for summary judgment. Defendants argue that Plaintiffs cannot show that the Ferruzzi Group controlled either the futures market or the deliverable supply of cash soybeans, nor have they presented any reliable evidence that Defendants actually disseminated any false information. The court disagrees,

finding there are factual disputes with regard to each of these three issues.

### a. *False reports*

Plaintiffs assert that Defendants misled regulators in two ways—first, by exaggerating Central Soya's processing needs, and second, by failing to report cancellation of a contract to ship 200,000 metric tons of soybeans to the Soviet Union. Because administrative agencies, particularly the USDA and CFTC, collect, compile, and disseminate such information, Plaintiffs argue that Defendants were able to manipulate the market's perceived demand for soybeans—and hence their price—through such alleged falsehoods.

As proof of these claims, Plaintiffs have submitted copies of FUSA's export reports (P.Ex. 26), which have been analyzed by Plaintiffs' expert Robert Ellis. Ellis found that they reflect an excess demand of 200,000 metric tons, for which there was no contract with the USSR and which should not have been registered with the USDA as an outstanding sale. (Ellis Rep. at 3–5, 6–8, P.Ex. 4.) From this evidence, Ellis concluded that the documentation "strongly suggests" that a portion of the purported sales to the former Soviet Union was knowingly fictitious. (*Id.* at 7–8.) Plaintiffs' other expert, Professor Thomas Hieronymous, reached the same conclusion. (Hieronymous Rep. at 17.) Also, both Hieronymous and Ellis concluded that Central Soya had no need for millions of bushels of soybeans that FUSA had stored at its warehouses; thus, they dispute Defendants' claim that they were engaged in *bona fide* hedging. (*Id.* at 10–15, 19–22; Ellis Rep. at 5–6, 8–9; Pls.' 12(n) Statement ¶¶ 69, 82–83, 86, 92–93, 95–98, 101–06.)

Defendants, however, insist that the statements and reports they made regarding their processing and export needs were accurate, and that their long positions were *bona fide* hedges against these requirements. (Defs.' 12(m) Reply ¶¶ 44–47, 55–63.) For example, Defendants explain that the export contracts were between the USSR and FTI, not FUSA. FTI is not a U.S. company; thus, it was not required to notify the USDA of its export contracts or their cancellation. (Defs.' 12(m) Reply ¶¶ 38, 45, 56, 57.) FUSA, on the other hand, was obligated to report only its own contracts with FTI, not the total of the Ferruzzi Group's activities with the USSR. (*Id.*) Defendants' expert Paul Charnetzki analyzed the reports that FUSA had filed with the USDA and concluded that they accurately reflected FUSA's contracts to supply FTI's export requirements. (Charnetzki Aff. ¶¶ 19–22, D.R.Ex. 8.) Charnetzki and other Ferruzzi witnesses also asserted that the Ferruzzi Group was engaged in *bona fide* hedging, and that Central Soya did in fact need the soybeans stored in its warehouses. (*Id.* ¶¶ 8, 12–17; Defs.' 12(m) Reply ¶¶ 8, 31–37, 69, 82–86, 95–106, 111, 119, 125, 129, 157.)

When viewed in the light most favorable to Plaintiffs, these assertions demonstrate that there are genuine issues of material fact regarding the Ferruzzi's true processing and export needs. For the same reason, the court also rejects Defendants' argument that Plaintiffs have presented no reliable evidence that the Soviet export contracts had any effect on prices. While recognizing that Defendants' expert Bradford Cornell has concluded that reports of such contracts had no effect on prices of cash soybeans in Illinois (Defs.' 12(m) Reply ¶¶ 42–43, 48, 60; Cornell Rep. at 12, D.R.Ex. 2), the question at this juncture is whether Defendants had the *ability* to influence prices, not whether their reports actually caused artificial prices. Plaintiffs's expert has offered a common-sense observation that commodity prices tend to rise with news of export contracts and fall with news of their cancellation. (Ellis Aff. ¶¶ 32–34; Ellis Dep. at 94, 168–70, D.Ex. 20.) Although Ellis did not perform any specific analysis on this question, there is some indication in the record that soybean prices soared in November 1988 as a result of rumors of exports to the Soviet Union.[22]

---

**22.** The news article in question does not mention the Ferruzzi Group or any other agricultural firm by name. The article explains that the USDA had reported that 250,000 metric tons of soybeans had been sold to the USSR and another 250,000 had been sold to destinations unknown; the article then indicates that the Soviet Union was the likely purchaser of the second contract as well. (Rajan Moses, *Soybean Prices Soar on*

(Rajan Moses, *Soybean Prices Soar on Rumour of Soviet Purchases,* Reuter Library Report, November 2, 1988, included in P.Ex. 26.) It is not unreasonable to infer, then, that prices might have fallen had the Ferruzzi Group or USDA reported the cancellation of their November 1988 contract with the Soviet Union. Taken together, these and other materials indicate that there is a genuine issue of material fact regarding the effects of Defendants' export reports on prices.

In light of the evidence submitted by both parties, and drawing all reasonable inferences in favor of Plaintiffs, the court finds that there are genuine issues of material fact as to whether Defendants disseminated false information regarding their export and processing needs and whether this information contributed to their alleged influence on market prices.

### b. *Calculation of the relevant cash market*

Defendants also assert that Plaintiffs cannot show that the Ferruzzi Group controlled the cash market for soybeans during the relevant time period. Without such control, argue Defendants, there can be no long manipulation of the market, because the shorts would be able to obtain cash soybeans and thereby fulfill their delivery obligations without having to deal with the would-be manipulator. This, in turn, would deprive the manipulator of any ability to influence prices. (Defs.' Mem.Supp. at 25–27.)

 Control of the cash market is a common element in manipulation cases, yet Defendants' assertion that it is a necessary element is flawed as a matter of both law and fact. As mentioned earlier, *Henner,* 30 Agric. Dec. at 1232–39, 1280–87, made clear that control of the cash crop was not an essential element to manipulation. In the course of its opinion, *Henner* criticized *Volkart Bros., Inc. v. Freeman,* 311 F.2d 52 (5th Cir.1962), wherein the Fifth Circuit had held that cash control was essential to manipulation. The Seventh Circuit distinguished *Volkart* in its opinion in *Frey,* 931 F.2d at 1177, observing that *Volkart* "does not preclude the possibility of successful manipu-

lation without such control [of the cash market]." The court also explained that "to force a squeeze *there is no logical necessity for the dominant long to control the cash crop,* only that he put the shorts in the unsavory position of dealing with him in the face of a known shortage of cash commodities." *Id.* (emphasis added). Defendants quote only the second half of this sentence in their reply brief (Defs.' Reply at 5–6), failing to note that the first half essentially undermines their argument.

Even if the court were to accept Defendants' argument that control of the cash crop is necessary to prove manipulation, there is some question whether this issue is appropriate for summary judgment. Recent decisions have noted that determination of the relevant cash market is a "fact-intensive question, a task that has given a number of courts difficulty in a variety of contexts." *Frey,* 931 F.2d at 1177 (citing cases). In this light, Defendants' reliance on case law to construct a theory of the relevant market may be misplaced, given that the "principles" so derived may have limited applicability when divorced from their specific set of facts. Also, as stated before, this case involves a unique theory of manipulation through a combination of market power and disinformation, which limits somewhat the precedential value of cases involving market power alone.

Yet Defendants have carefully constructed a model of the relevant market that deserves this court's attention. Defendants assert that the relevant cash supply consists of those stocks that are already in deliverable locations, plus all stocks that can be moved into position and delivered against the contract before it expires. (Defs.' 12(m) Statement ¶ 29; Defs.' 12(m) Reply ¶ 134.) In this case, Defendants' expert ("applying correct legal principles," Defendants explain) found that the relevant supply of soybeans deliverable against the July and August 1989 contracts consisted of all stocks within at least 350 miles of Chicago. (Defs.' 12(m) Reply ¶ 134.) Defendants then assert that between June 1 and July 1, 1989, there were some 187–244 million bushels of soybeans within 350 miles of Chicago and 265–344

*Rumour of Soviet Purchases,* Reuter Library Report, November 2, 1988, P.Ex. 26.)

million bushels within 500 miles of the city, of which approximately one-half remained uncommitted for delivery. (Defs.' 12(m) Statement ¶¶ 38–40.) Moreover, as late as July 11, 1989—the date of the CBOT's emergency order—there were still seven trading days remaining on the July contract and thirty days on the August contract, plus an additional seven-day "grace period" for the shorts to deliver on their contracts. (Id. ¶ 33; Defs.' Mem.Supp. at 28.) Based on these facts, Defendants argue that the shorts had ample time and opportunity to move stocks into Chicago and fulfill their contracts without having to deal with the Ferruzzi Group.[23] (Defs.' 12(m) Statement ¶¶ 29–42; Defs.' 12(m) Reply ¶ 160; Defs.' Mem.Supp. at 27–28.)

Plaintiffs dispute Defendants' analysis of the cash market, arguing that the movement of additional soybeans into Chicago during June and July would have been abnormal, counterseasonal and greatly disruptive to the movement, operations, and prices of the cash markets. (Id. ¶¶ 67, 134–42, 145, 158, 163; Ellis Aff. ¶¶ 12–16.) Consequently, Plaintiffs assert that for the purpose of determining Defendants' control of the cash crop, the relevant cash supply consisted solely of those stocks that were already present in Chicago's "normal" supply areas (Chicago and Toledo). (Pls.' 12(n) Statement ¶ 142.) Because Defendants allegedly owned virtually all of the warehouse receipts soybeans in Chicago and Toledo, Defendants controlled the relevant cash market, argue Plaintiffs.[24] (Pls.' 12(n) Statement ¶¶ 78, 134–36, 142.)

Defendants respond that Plaintiff's "normal soybean movement" theory is both factually and legally incorrect. Some of Defendants' objections, such as the absence of proper support for some of Plaintiffs' assertions, are well-justified. (Defs.' 12(m) Reply ¶¶ 134–42.) Other objections, such as assertions that soybeans do move into Chicago and Toledo during the summer months and that the Ferruzzi Group did not own all the warehouse receipt soybeans (Defs.' 12(m) Reply ¶ 67), only underscore the existence of certain factual issues rather than dispel them. Thus, the court cannot ignore Plaintiffs' theory for the purposes of this motion.

The parties' competing theories of the relevant cash market also raise another, more fundamental question—what factors should go into the calculation of the relevant market? Defendants' view of the relevant market rests almost entirely on the distance and time to move other supplies to Chicago. Previous cases, however, indicate that other factors can be involved as well. Among the more important of these factors is the willingness of the market to absorb the added costs involved in bringing out-of-town supplies to market. For example, in *Great Western*, 201 F.2d at 480–81, the Seventh Circuit found that the storage, freight, and other costs involved in bringing out-of-town eggs to market created an "economic impediment" that served to exclude such stocks from the deliverable cash supply.[25] Similarly, in *Cargill*, 452 F.2d at 1165–66, the Fifth Circuit, relying on *Great Western*, found that out-of-town supplies of higher grade, more

---

**23.** Alternately, Defendants assert that based on Plaintiffs' figures (which they do not concede), their long position in July futures as of July 11 represented less than 14% of the cash supply within 350 miles of Chicago and less than 10% of the cash supply within 500 miles. (Defs. Mem. Supp. at 29–30.) Thus, Defendants argue that it was impossible for them to control the supply of cash soybeans deliverable against the July contract. (Id.) Also, given the time remaining on the August contract, Defendants maintain that they could not have controlled the supply relevant to the August contract either. (Id.)

**24.** Plaintiffs also offer a table purporting to show that the cash position (in bushels) held by Defendants was much greater than those held by defendants in other key manipulation cases. (Pls.'

Mem.Opp. at 18.) Plaintiffs, however, are comparing apples and oranges—or, specifically, soybeans (here), wheat (*Cox* and *Cargill*), and corn (*Indiana Farm Bureau*). By listing the parties' holdings only in bushels and not as percentages of the relevant cash market, it is impossible to make any meaningful comparisons between these cases.

**25.** Specifically, the Seventh Circuit noted that out-of-town supplies should be excluded from available supply, unless the prices of local eggs were raised to compensate for the added costs of transporting and storing the eggs. *Great Western*, 201 F.2d at 481. This could not occur, however, unless a party raised prices by controlling the local supply, which in itself would constitute artificial manipulation of the market. *Id.*

expensive hard wheat should be excluded from the relevant supply of winter wheat because of its higher costs. By contrast, in *Cox, supra,* at 34,062–064, the CFTC included higher grades of out-of-town wheat in the relevant cash supply because the market was prepared to pay premium price differentials for delivery of such wheat.[26]

These are not mere academic questions. With the exclusion of out-of-town stocks in *Cargill* and *Great Western,* the relevant cash supply appeared smaller and the defendants' holdings proportionately larger, which, in turn, led to findings that the defendant controlled the cash supply and thus could and did manipulate prices. Inclusion of out-of-town stocks in *Cox,* however, meant that the deliverable supply appeared larger and the defendants' holdings relatively smaller, which led to a finding that the defendants did not control the cash market and, ultimately, was one reason why the CFTC dismissed charges of manipulation against the defendants. Here, there is a genuine issue of material fact as to what constituted the deliverable supply of cash soybeans, that is, whether the relevant supply constituted only of stocks in Chicago and Toledo or included all stocks within 350–500 miles of Chicago as well. Thus, it is impossible for the court to determine at this juncture whether Defendants controlled that supply, let alone whether and to what extent control of the cash supply is necessary to find that Defendants had the ability to influence prices.

As a final matter, the court notes that in their reply brief, Defendants attempt to shift the focus from market definition to the shorts' contractual obligations. (Defs.' Reply at 7.) Relying on *Cox,* Defendants assert that the shorts are required to honor their delivery commitments even if this means going at least 350 miles outside Chicago's "normal" supply areas to find, purchase, and transport adequate amounts of cash soybeans. (*Id.* at 7–8.) This would have the practical effect of expanding the relevant cash supply and lowering the degree of Defendants' control over the cash market.

The court is unwilling to accept Defendants' view of the relevant cash market, however. By focusing only on the shorts' obligation to deliver the commodity as promised, Defendants are effectively ignoring the time, cost, and difficulty of bringing additional supplies to market. As stated earlier, these are essential questions that can only be answered after a complicated, fact-intensive inquiry. Moreover, Defendants' reliance on *Cox* is misplaced. In the section of *Cox* quoted by Defendants, the CFTC was trying to determine whether to include in the deliverable supply those quantities of wheat that were owned and stored on barges by the dominant short. *See Cox, supra,* at 34,062. The CFTC elected to include this "barge wheat" in the deliverable supply because there was no evidence that the short could not have delivered the wheat prior to the expiration of his contract. *Id.* The cost and compensation of bringing such supplies to market apparently were not at issue, even though later in the same opinion they were key factors in the CFTC's inclusion of other sources of out-of-town wheat in calculation of the relevant cash supply. *Id.* at 34,062–063. Moreover, the issue of the shorts' contractual obligations was explored at length in *Henner,* 30 Agric. Dec. at 1264–80, wherein the USDA explained that the shorts have a right to expect that they will be able to offset their obligations in the futures market, given the very low percentage of futures positions that actually result in physical delivery of the cash commodity. *Henner* further explained that requiring the shorts to make extraordinary efforts to satisfy their obligations may itself be proof of a squeeze or corner on the market. *Id.* The court finds Defendants' attempt to shift the entire burden to the shorts unpersuasive, where Plaintiffs have alleged that the shorts could not have shipped additional supplies to Chicago without added expense and disruptions to the cash market.

In sum, the court finds that there are genuine issues of material fact regarding the calculation of the relevant cash market and

---

**26.** The fact-finders in *Cox* also had to consider whether to count "barge wheat" controlled by the dominant short (included) and supplies already committed to satisfy milling and other needs (excluded) in the deliverable supply. *Cox, supra,* at 34,061–064.

thus whether Defendants controlled such market. Furthermore, there are mixed questions of law and fact as to whether and to what extent control of the cash market is necessary to Plaintiffs' claim, particularly in light of Plaintiffs' theory that Defendants were able to manipulate prices through a combination of market power and disinformation.

### c. *Control of futures market*

Defendants have argued that the ability to influence prices requires control of *both* the cash and futures markets. Having found that there are factual (and legal) disputes regarding Defendants' control of the cash market, the court could find there is a genuine issue of material fact regarding Defendants' ability to influence prices without having to consider the question of their control of the futures market. Nonetheless, there are important factual and legal issues at stake that the court feels compelled to address.

 In an effort to show that they lacked control of either the July and August 1989 futures market, Defendants compare their long positions with the positions held by defendants in other key manipulation cases. Defendants maintain that during most of the relevant time period, they held substantially less than 50% of the long open interest in the July contract and never more than 63%—a level they reached only on July 11, 1989. (Defs.' 12(m) Statement ¶ 48.) Defendants then note that even at its peak, their position was far less than that held by the alleged manipulators in *Cox* (97% on the last day of trading) and *Volkart* (90%). *See Cox, supra,* at 34,059; *Volkart,* 311 F.2d at 56. Although they admit their position barely exceeded that in *Cargill* (62%), 452 F.2d at 1164–65, Defendants seek to distinguish this case by arguing that they, unlike Cargill, did not have control of the cash market. (Defs.' Mem.Supp. at 31–32.) These comparisons become even more noteworthy with regard to the August contract, in which Defendants purportedly never held more than 18% of the open long interest.[27] (Defs.' 12(m) State-

ment ¶ 49.) Thus, Defendants assert that "as a matter of law" their positions in the July and August contracts were too low to establish an ability to influence prices. (Defs.' Mem.Supp. at 31.)

The court recognizes that successful manipulation claims typically involve long positions greater than those held by Defendants. In addition to the cases cited by Defendants, the court takes note of *G.H. Miller & Co. v. United States,* 260 F.2d 286, 289 (7th Cir. 1958), *cert. denied,* 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959), in which the defendants held 78–100% of the egg futures market and some 72–99% of the deliverable supply, and *Great Western,* 201 F.2d at 480, in which the defendant held between 60–75% of open long contracts and the majority of the deliverable cash supply. Moreover, the court recognizes that Defendants' relatively minor position in August futures, taken together with the amount of time remaining for the shorts to deliver on their August contracts, signals that Defendants' ability to influence the prices of the August futures may have been far less than that for the July contract, if there were any influence at all. Finally, Defendants' position is bolstered somewhat by the fact that control of the futures market is typically measured as a percentage of the open long interest, which is a far easier factual determination to make than what is required to evaluate the relevant cash market.

 Nevertheless, this court remains unwilling to accept Defendants' argument that "as a matter of law" their long positions were too low to afford the ability to influence prices. As Defendants themselves admit (Defs.' Mem.Supp. at 31), neither the courts, Congress, nor the CFTC has ever defined a minimum percentage of the open interest that is necessary to establish control of the futures market. Moreover, there are factual distinctions that limit the value of Defendants' analogies to *Cargill* and other cases. Here, the Ferruzzi Parties are accused not only of dominating the cash and futures mar-

---

27. Plaintiffs generally dispute this assertion but offer no specific objections or citations to the record (Pls.' 12(n) Statement ¶ 159); thus, Defen-

dants' assertion regarding their August long position is admitted for the purposes of this motion.

kets but also of exaggerating their true processing and export needs. When these alleged misrepresentations are factored into their alleged ability to influence prices, one might reasonably infer that Defendants might not have required as large a position in the futures (or cash) market as would a manipulator relying on market power alone. There is also some question whether a party conducting a concerted, long-term campaign of manipulation, as alleged here, would require a greater or lesser position in the futures (and cash) market than would a party attempting to influence prices only on the last day or days of trading, as was the case in *Cargill, Cox,* and *Volkart.*

In closing, the court notes that in opposing Defendants' motion, Plaintiffs do not seriously contest Defendants' figures on their individual July and August positions. Instead, Plaintiffs aggregate Defendants' July and August holdings, which they assert rose from approximately 14% at the beginning of the class period (June 1, 1989) to 29% at the end of the period (July 11, 1989). (Pls.' Mem. Opp. at 34 n. 28.) Defendants argue that Plaintiffs' "piggy-backing" of their August claim onto their July claim is improper and shows that Plaintiffs do not believe that Defendants possessed the ability to manipulate the prices of August futures. (Defs.' Reply at 13.) Defendants' objection has some merit, in that the July and August futures were separate contracts, and their position in the August futures was not as great as that represented by the aggregation of their July and August holdings. Yet at this point in time, the court is unwilling to dismiss Plaintiffs' calculation out-of-hand. Defendants already had allegedly "rolled over" their May futures into July; thus, it would not have been unreasonable for market observers to believe that Defendants intended to roll their July futures into August. Plaintiffs should take note, however, that in none of the cases cited by the parties has a fact-finder employed such an aggregate measure to find that an alleged manipulator had control over the futures market. At future stages of this litigation, then, Plaintiffs should be prepared to discuss Defendants' positions (and control) in the July and August futures individually, not in the combination.

In sum, there appears to be little question about the size of Defendants' long positions in the July and August futures. In this respect at least, this issue differs from Defendants' position in the cash market, where there were factual disputes regarding the definition of the relevant supply and thus of the relative size of their holdings. Nevertheless, with regard to both the futures and cash markets, there are genuine issues of material fact as to whether Defendants' positions were such that Defendants were able to influence market prices. These questions become particularly unclear when the effects of the Ferruzzi's alleged misrepresentations are taken into account. Consequently, Defendants' ability to influence market prices requires factual determinations that are beyond the scope of what is permissible on summary judgment.

### B. *Evidence of artificial prices*

The court's finding of genuine issues of material fact regarding the Ferruzzi Parties' ability to influence prices does not necessarily mean defeat for Defendants' motion for summary judgment on Plaintiffs' manipulation claim. Defendants also argue that Plaintiffs cannot show that prices of the July and August soybean futures were ever artificial. Artificiality is a "crucial element" of a manipulation claim, without which Defendants cannot be found liable for manipulation, regardless of their "power and opportunity" to influence prices.[28] *See Cargill,* 452 F.2d at 1167. If Plaintiffs cannot establish that the prices were artificial, then Defendants' motion for summary judgment must be granted on Count I. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (summary judgment must be granted where the plaintiff fails to establish an essential element of his claim).

---

**28.** In general, a price is said to be "artificial" or "distorted" if it "does not reflect the market or economic forces of supply and demand" operating upon it. *See Cox, supra,* at 34,064; *Indiana Farm, supra,* at 27,288 n. 2. *See also Sullivan & Long, Inc. v. Scattered Corp.,* 47 F.3d 857, 861–62 (7th Cir.1995) (case involving alleged manipulation in securities market).

In support of their motion, Defendants focus on the reliability—hence, the admissibility—of an analysis of price manipulation prepared by Plaintiffs' leading expert, Professor Thomas Hieronymous. In his report, Hieronymous prepared a table purporting to show on a daily basis the amounts by which the prices of the July and August soybeans futures had been manipulated. Specifically, Hieronymous concluded that the price of July 1989 futures was artificially inflated by $0.37 per bushel on June 1, 1989, an increment that rose steadily to a high of $1.13 per bushel on July 5 before heading downward to $0.61 per bushel on July 11 (the date of the CBOT's emergency order) and $0.21 per bushel on July 12. (Hieronymous Rep. at 22–23.) Similarly, he reported that the artificial increment to August futures prices rose steadily from $0.22 per bushel on June 1 to $0.93 per bushel on July 5, then fell to $0.37 per bushel on July 11 and $0.11 per bushel on July 12. (*Id.*) During his deposition, however, Hieronymous was unable to describe his analysis or explain how he derived these seemingly precise figures but referred only to a "massive matrix of information" that he claimed he had stored in his head. (Hieronymous Dep. at 205–09.) Defendants assert that Hieronymous' analysis amounts to unreliable, unverifiable conjecture, which cannot be admitted as valid expert testimony. (Defs.' Mem.Supp. at 33–37.) Absent any other proof that the soybean prices were indeed artificial, Defendants assert that Plaintiffs' claim of manipulation must be dismissed. (*Id.*)

Had the court been presented only with Professor Hieronymous' report and deposition testimony, the court likely would have agreed that his day-by-day analysis of the artificiality in July and August futures prices is unreliable and unverifiable. In his own report, Hieronymous stated that it was "impossible to say, absolutely and precisely" what the true, non-artificial prices would have been absent Defendants' alleged manipulative acts (Hieronymous Rep. at 23)—a statement that causes the court to wonder

how he could have calculated down to the penny the level of artificiality on each day over a six-week period. On this basis alone, Hieronymous' massive matrix of information would have appeared to have been little more than pulling numbers out of thin air, which is unacceptable as objective, expert testimony. *See Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 186 (7th Cir.1993) ("any and all [expert] testimony or evidence admitted [must be] not only relevant, but reliable") (quotes omitted); *Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 616 (7th Cir.1993) ("opinions unsupported by any method—generally accepted or otherwise" properly excluded); *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.1989) ("expert who supplies nothing but a bottom line supplies nothing of value to the judicial process").

Yet the court cannot rest there. In an effort to bolster the credibility of Hieronymous' findings, Plaintiffs attached to their response brief an affidavit from the Professor, in which he recounts the objective factors and methods that went into his price analysis. (Hieronymous Aff. ¶¶ 16–33, P.Ex. B.) For example, Hieronymous opined that FTI's futures holdings were equivalent to the artificial demand created by the Ferruzzi Group's holdings; he then calculated FTI's futures position as a percentage of the relevant cash supply; used a demand-elasticity coefficient[29] of 0.5 to calculate the degree by which cash prices had been artificially inflated; and then applied the resulting percentage to the cash price on a given day to calculate the amount of artificiality in dollars and cents. (*Id.* ¶¶ 18–20, 21(b).) Hieronymous also estimated that the amount of artificiality in the prices for July and August futures increased at least a penny per day, which rose to two or three pennies per day during Defendants' alleged conduct of certain manipulative acts, such as the Ferruzzi Group's storage of unneeded beans at Central Soya's warehouses. (*Id.* ¶¶ 24–28.) He claims that these were among the objective factors he used to find that prices of the July

---

**29.** An elasticity of 0.5 means that each 1% increase (decrease) in demand will result in an increase (decrease) in prices of approximately 2%. (Hieronymous Rep. at 31, P.Ex. 3.) Hiero-

nymous explained that his estimate of elasticity is the "most reasonable approximation" but is not a precise physical measurement. (Hieronymous Aff. ¶ 18 n. 11, P.Ex. B.)

and August 1989 soybean futures contracts had been artificially inflated.

Defendants object to admission of Hieronymous' affidavit, because he never identified these factors or calculations during his two days of deposition testimony.[30] Defendants assert that Hieronymous testified that the figures were a matter of his personal judgment (Hieronymous Dep. at 241), a statement the Defendants believe starkly contradicts the explanations he provides in his affidavit. Consequently, Defendants argue that his affidavit cannot be admitted into evidence.

The court shares Defendants' concerns to some extent. Plaintiffs or their expert should have laid a more adequate foundation for Professor Hieronymous' conclusions either in his report or his testimony, rather than waiting until submission of their response brief to Defendants' motion to provide some much-needed explanations. Also, his affidavit does appear to conflict with his deposition to the extent that he had testified that he had not prepared any quantitative analysis in reaching his conclusions, nor had he proceeded in the "step by step" manner that would later characterize portions of his subsequent affidavit. (Hieronymous Dep. at 207.) Moreover, the calculations and coefficients he applies in his affidavit appear to contradict his earlier testimony that he simply looked at a mass of information and attached "some number," which he could not put into terms of "two plus two equals four." [31] (Id.)

▪ Yet for the purposes of this motion only, the court is unwilling to disregard Professor Hieronymous' affidavit entirely. In a case cited by Defendants, the Seventh Circuit explained that there are only a limited number of circumstances under which a party may avoid summary judgment by submitting a conflicting affidavit, but among these circumstances is "to clarify ambiguous or confusing deposition testimony." Adelman–Tremblay v. Jewel Cos., 859 F.2d 517, 520 (7th Cir.1988). In this case, Professor Hieronymous testified that he could not recall all of the factors that led him to conclude that prices had been artificial or that the level of artificiality had changed, but that he might be able to refresh his recollection by sitting down again with the data and documentation. (Hieronymous Dep. at 207–09, D.Ex. 50.) This indicates that his testimony was partly ambiguous and in need of clarification. Moreover, in another case cited by Defendants, the court noted that questions regarding the bases and sources of an expert's opinion generally affect the weight rather than admissibility of the evidence. See Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir.1987). Although the court in Viterbo elected to discard the suspect evidence, this court does not find Professor Hieronymous' report, testimony, or affidavit to be of such little value that they may not be considered as evidence for the purposes of this motion only. See id.

On a more fundamental level, the court notes that its duty here is not simply to pass judgment on the adequacy of Professor Hieronymous' analysis (or the skills of Plaintiffs' lawyers, for that matter) but to determine whether the facts are sufficiently clear as to avoid the need for a trial. In Babrocky v. Jewel Food Co., 773 F.2d 857, 861 (7th Cir. 1985), the Seventh Circuit explained that "[s]ummary judgment is intended to avoid a useless trial and is appropriate only where it is quite clear what the truth is." Here, the truth is far from clear. Even if the court were to strike Hieronymous' table of artificial price increments and those portions of his affidavit that conflict with his earlier testimony, there remains other evidence in the record regarding the alleged artificiality of

---

30. Defendants have since had the opportunity to depose Professor Hieronymous again, but as of the time of this writing the parties have not sent the court a transcript of this deposition.

31. Hieronymous did explain in his affidavit, however, that it is "impossible" to describe the amount of artificiality in "precise figures," because mathematical equations and econometric models could not adequately address the complexity, variety, or interdependence of the variables involved in this analysis. (Hieronymous Aff. ¶ 15(a), P.Ex. B.) While this statement may reinforce certain statements he made during his deposition, it also undermines this court's confidence in the table of figures he presented in his original report.

prices for the July and August soybean futures that must be considered. For example, Plaintiffs assert that the average spread in prices between July and August futures "exploded to record levels" during the alleged period of manipulation when compared to the same period during preceding years. (Pls.' Mem.Opp. at 7–8; Pls.' 12(n) Statement ¶ 114.) Similar results were found with respect to the average August–November price spread and the July–November price spread. (*Id.*) Also, Professor Hieronymous found record inversions in the cash and futures market,[32] as well as "abnormally high" levels for CBOT prices relative to prices in other market areas and peculiarities in the price relationships between soybeans and soybean products in both the cash and futures markets. (Hieronymous Rep. at 29–30, P.Ex. 3; Hieronymous Aff. ¶¶ 9–12; Pls.' Mem.Opp. at 7–8; Pls.' 12(n) Statement ¶ 116.) Finally, Plaintiffs assert that the futures market began to trade independently of the cash market, which, in Hieronymous' words, represented an "extraordinary 'de-linking' " of the two markets. (Hieronymous Aff. ¶ 11; Pls.' 12(n) Statement ¶ 115; Pls.' Mem.Opp. at 7–8.)

Defendants dispute the accuracy, relevance, and support for these assertions. For example, Defendants respond that the inverse spread relationships were neither unprecedented nor inconsistent with inverse spreads in other crop years, nor do they necessarily indicate that the market was not functioning properly. (Defs.' 12(m) Reply ¶ 114.) Moreover, Defendants assert that prices in the cash and futures market remained highly correlated, and that price relationships in the cash and futures markets were virtually the same as in previous years. (*Id.* ¶ 116.) These assertions, however, only underscore the presence of a factual dispute. As for Defendants' objections to Plaintiffs' reliance on Professor Hieronymous' report and affidavit, the court has discussed these concerns earlier.

Having found the existence of a "genuine issue," the court also finds that it involves a "material fact," one that would affect the outcome of the case under governing law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The factual assertions above resemble the kind of historical and contemporaneous price analyses typically reviewed by factfinders for evidence of price artificiality. *See Cox,* p. 34,064 ("Proof of artificiality generally has focused on significant deviations from normal historical futures market patterns and from related contemporaneous markets.") For example, in *Cargill,* 452 F.2d at 1167–70, and *Great Western,* 201 F.2d at 482–83, the courts relied almost exclusively on historical analyses of the movements in futures prices—such as the "spread" in prices between the suspect futures and contracts due in a later trading month, the spread between futures and cash prices, and the spread in prices between futures traded in the suspect and "normal" markets—for evidence of price artificiality. *See Cargill,* 452 F.2d at 1154, 1167–70; *Great Western,* 201 F.2d at 482–83. *See also Henner,* 30 Agric. Dec. at 1208–23 (finding strong proof of manipulation in the drastic change in spreads four or five months prior to the delivery month on a single day of trading in the absence of any significant economic news). In *Cox* and *Indiana Farm Bureau,* on the other hand, the fact-finders also compared futures prices with contemporaneous changes in the cash markets to see if there were any significant deviations that may indicate that prices had been manipulated.[33]

---

**32.** In an "inverted" market, the price for a nearby futures contract is higher than that for a more distant contract. Commodity Trading Manual, *supra,* at 94–95. Ordinarily, the price of the more distant contract is higher due to the "carrying charges," particularly the costs of storage, insurance, and interest on the invested capital. *Id.* Although an inverted market may signal that prices have been manipulated, it may be the result of legitimate factors as well, such as a surprisingly strong immediate demand in the cash market, a scarcity of cash supplies, or the willingness of elevator owners to store grain for their own accounts at below the full storage cost. *Id.;* Hieronymous Rep. at 14 n. 4.

**33.** Contemporaneous comparisons between the futures and cash markets are based on the fact that prices in the markets generally should move in the same direction because they respond to the same economic forces, e.g., low supply due to droughts or poor harvests or increased demand due to exports. Commodity Trading Manual, *supra,* at 13–14. Moreover, cash and futures prices tend to converge as the delivery date approaches; thus, they become readily substitutable for each

■ The court recognizes that these tests—to say nothing of Plaintiffs' actual assertions—are not necessarily dispositive of the question whether the prices of the July and August futures were artificial. Both *Cox, supra,* at 34,065, and *Indiana Farm Bureau, supra,* at 27,286, cast doubt on the value of historical price comparisons, while *Cox* referred to contemporaneous futures—cash market comparisons as "only a crude measuring tool" to detect artificial prices. One scholar has gone so far as to conclude that it is "virtually impossible" to measure an artificial (or, conversely, a natural, non-artificial) price, due to the complex, dynamic, and interdependent nature of markets and market forces. *See* Markham, *supra,* at 284. These questions go only to the weight of the evidence, however, and cannot be resolved on a motion for summary judgment.

One final aspect of Plaintiffs' discussion of price artificiality warrants discussion. While Plaintiffs did present some evidence of historical and contemporaneous price comparisons, Plaintiffs seem to rely primarily on a third measure of artificiality—one that emphasizes the nature of Defendants' conduct rather than objective price data. Plaintiffs' theory rests on a footnote to *Indiana Farm Bureau,* in which the CFTC explained that when trading in the cash market is thin, the futures market may be *the* relevant market because traders are in effect buying and selling the commodity:

> Thus, to determine whether an artificial price has occurred, one must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market. When the aggregate forces of supply and demand bearing on a particular market are all legitimate, it follows that the price will not be artificial. *On the other hand, when a price is affected by a factor which is not legitimate, the resulting price is necessarily artificial.* Thus, the focus should not be as much on

the ultimate price as on the nature of the factors causing it.

*Indiana Farm Bureau, supra,* at 27,288 n. 2. (emphasis added), quoted in *Cox, supra,* at 34,064. *See also Henner,* 30 Agric. Dec. at 1203–08. On this basis, Plaintiffs argue that Defendants' alleged misconduct *necessarily* resulted in artificial prices; thus, evidence of Defendants' alleged manipulative acts is sufficient proof of the existence of artificial prices. Professor Hieronymous makes the same argument in both his report and affidavit, wherein he states that his detailed description of Defendants' alleged manipulative acts provides "precisely the analysis necessary to prove price artificiality." (Hieronymous Aff. ¶¶ 4, 8 (quotes omitted); Hieronymous Rep. at 22–32.)

■ The court recognizes that there is no universally accepted measure or test of price artificiality, and that this element can be closely interrelated with the other three elements of a manipulation claim, as Plaintiffs suggest. Yet the court is unwilling to find as a matter of law that misconduct alone is sufficient proof of price artificiality. The quoted footnote in *Indiana Farm Bureau* was mere *dictum* in the CFTC's decision—a decision that turned primarily on the question of intent rather than proof of price artificiality. The CFTC's only substantive discussion on the latter point was the observation that historical price comparisons were of limited value in that case because of the unique combination of legitimate market factors. *See Indiana Farm Bureau, supra,* at 27,286–287. Moreover, although the CFTC later quoted this footnote in *Cox,* the Commission's analysis of price artificiality in *Cox* relied on traditional historical and contemporaneous price comparisons, not evidence of misconduct. *Cox, supra,* at 34,064–066. Similarly, *Henner,* 30 Agric. Dec. at 1194–1258, discussed both the legitimacy of the market forces and more traditional measures of price artificiality. In short, Plaintiffs have cited no case in which artificiality and conduct have been collapsed into a single element, as Plaintiffs (and Professor Hierony-

---

other. EMERGENCY ACTION, *supra,* at 8. Without that convergence, there would be great imbalances in the market, as traders would rush to

buy the less costly item to trade against the higher priced item. *Id.*

mous) are attempting to do. At future stages of this litigation, Plaintiffs would be well-advised to present substantive, objective evidence of price artificiality rather than rely on allegations of misconduct alone.

In sum, the court finds that there is a factual dispute whether prices of the July and August 1989 soybean futures were artificial. While Professor Hieronymous' table of artificial increments is of questionable value, Plaintiffs' evidence of record inversions in the cash and futures markets, abnormal spreads in futures prices, and a "de-linking" of cash and futures prices is sufficient to show that there is a genuine, material issue that cannot be resolved by summary judgment. The court does not accept Plaintiffs' theory that price artificiality can be established through proof of misconduct alone, however.

### C. *Causation of artificial prices*

■ Defendants also assert that Plaintiffs cannot show that the Ferruzzi Parties caused the prices of July or August futures to be artificial. This issue does not appear as a major issue in either brief; rather, Defendants argue that if Plaintiffs cannot show the *ability* to influence prices or the *existence* of artificial prices, then Plaintiffs cannot show that Defendants *caused* artificial prices. (Defs.' Mem.Supp. at 2–3, 22; Pls.' Mem.Opp. at 31.) The court, however, has found factual disputes regarding both Defendants' ability and the existence of artificial prices; thus, the court has no difficulty finding a genuine issue of material fact regarding Defendants' alleged causation of such prices.

### D. *Intent to cause artificial prices*

In their final attack on Plaintiffs' manipulation claim, Defendants argue that the claim against Central Soya must be dismissed because there is no evidence that Central Soya knew of Ferruzzi's alleged manipulative scheme or specifically intended to participate in such a scheme. Furthermore, Defendants argue that intent cannot be inferred from Central Soya's actions because it was already fully hedged against its needs and, as a processor of soybeans, it would not have benefit-

ted from higher futures prices. (Defs.' Reply Mem. at 15–16.)

■ The court recognizes that a manipulation claim requires a showing of specific intent, that is, a showing that "the accused acted (or failed to act) with the purpose or conscious object" of influencing prices. *Indiana Farm Bureau, supra,* at 27,283. The CFTC went on to explain that "proof of intent will most often be circumstantial in nature" and may be inferred from the defendant's conduct, such as the intentional acquisition of market dominance and a subsequent squeeze of the shorts. *Id.* at 27,283–285. Merely seeking the best price for one's commodity is insufficient evidence of intent to manipulate prices. *Id.*

■ As a general matter, however, questions of intent are inappropriate for resolution on summary judgment—a doctrine acknowledged by Defendants in their briefs and supported by a case they cite, *Powers v. Dole,* 782 F.2d 689, 696 (7th Cir.1986). Defendants note that *Powers* includes an exception to this rule where "the plaintiff presents no indication of motive and intent supportive of his position." *Id.* Defendants then proceed to attack many of Plaintiffs' factual assertions as irrelevant or unsubstantiated in order to show that there is such a lack of proof of motive or intent in this case. While recognizing that some of Defendants' objections have merit, the court believes there are still some open questions regarding the extent to which Central Soya knew of or participated in the Ferruzzi Group's plans. After all, Central Soya participated in a number of discussions and correspondence with the CFTC and CBOT during May, June, and July 1989, so there is some question whether the information they provided regarding their processing needs, their market positions, and their hedging strategy was accurate. Also, there are questions regarding Central Soya's agreement to store some 4.5 million bushels of the Ferruzzi Group's soybeans and its need (or not) for these and other soybeans supposedly purchased on its behalf by Ferruzzi. Defendants' assertion that Central Soya did not stand to gain from the alleged manipulative scheme is not relevant, given that other cases have found that a

"profit motive" is not an essential element of a manipulation claim. *See Hohenberg Bros., supra,* at 21,478; *Cargill,* 452 F.2d at 1163.

In conclusion, the court finds that the question of Central Soya's intent to participate in the alleged manipulative scheme cannot be resolved on this motion. Likewise, there are genuine issues of material fact surrounding each of the other elements of Plaintiffs' manipulation claim—specifically, Defendants' ability to influence prices, the existence of artificial prices, and Defendants' causation of such prices. There are also mixed questions of law and fact regarding the tests that Plaintiffs must employ to establish each of these elements, such as the determination of the relevant cash market and the degree of control in the cash and futures markets necessary to create the ability to influence prices. In this climate of factual and legal uncertainty, the court should deny Defendants' motion for summary judgment as to Count I.

### III. *Common-law fraud claim (Count III)*

Finally, Defendants have moved for summary judgment as to Plaintiffs' common-law fraud claim. Defendants argue that in Illinois, one of the elements of common-law fraud is actual reliance by the plaintiff on the defendant's alleged misrepresentations or omissions. *See People ex rel. Peters v. Murphy–Knight,* 248 Ill.App.3d 382, 391, 187 Ill. Dec. 868, 874–75, 618 N.E.2d 459, 465–66 (1st Dist.1993), citing *inter alia Siegel v. Levy Organization Development Co.,* 153 Ill.2d 534, 542–43, 180 Ill.Dec. 300, 304, 607 N.E.2d 194, 198 (1992); *Morse v. Abbott Labs.,* 756 F.Supp. 1108, 1112 (N.D.Ill.1991). Defendants assert that Plaintiffs have sought improperly to replace actual reliance with a general fraud-on-the-market presumption, which is not recognized in Illinois. In the absence of proof of actual reliance, Defendants move to dismiss Plaintiffs' claim.[34]

To their credit, Plaintiffs do not rest on the law-of-the-case doctrine alone but make several substantive arguments in support of their claim. Plaintiffs assert that corners and secret manipulations of the grain markets are "tainted with fraud" and historically illegal at common law. Yet the two primary cases cited by Plaintiff, *Samuel v. Oliver,* 130 Ill. 73, 22 N.E. 499 (1889) and *Foss v. Cummings,* 149 Ill. 353, 36 N.E. 553 (1894), were decided twenty-five to thirty years prior to enactment of the forerunner of the CEA, to say nothing of the case law and legislative amendments regarding private rights of action that followed decades later. Consequently, this court will not carve out a special tort for manipulation of the futures markets. Plaintiffs' claim must fit squarely within the elements of Illinois common-law fraud or be dismissed.

■ Unfortunately for Plaintiffs, one of the key elements of fraud or fraudulent misrepresentation in Illinois is reliance, a factor listed in every single one of the relevant cases they cite. *See, e.g., Mann v. Kemper Financial Cos.,* 247 Ill.App.3d 966, 971, 187 Ill.Dec. 726, 730, 618 N.E.2d 317, 321 (1st Dist.1992); *Heider v. Leewards Creative Crafts, Inc.,* 245 Ill.App.3d 258, 264–65, 184 Ill.Dec. 488, 494, 613 N.E.2d 805, 811 (2d Dist.), *app. denied,* 152 Ill.2d 559, 190 Ill.Dec. 889, 622 N.E.2d 1206 (1993); *Metzger v. New Century Oil and Gas Supply Corp. Income and Dev. Program—1982,* 230 Ill.App.3d 679, 692, 171 Ill.Dec. 698, 708, 594 N.E.2d 1218, 1228 (1st Dist.), *app. denied,* 146 Ill.2d 631, 176 Ill.Dec. 803, 602 N.E.2d 457 (1992); *Black v. Iovino,* 219 Ill.App.3d 378, 389, 162 Ill.Dec. 513, 520–21, 580 N.E.2d 139, 146–47 (1st Dist.1991), *app. denied,* 143 Ill.2d 636, 167 Ill.Dec. 396, 587 N.E.2d 1011 (1992); *Lidecker v. Kendall College,* 194 Ill.App.3d 309, 314, 141 Ill.Dec. 75, 78, 550 N.E.2d 1121, 1124 (1st Dist.1990); *Perlman v. Time, Inc.,* 64 Ill.App.3d 190, 194–95, 20 Ill.Dec. 831, 835, 380 N.E.2d 1040, 1044 (1st Dist.1978). Rather than deal with this issue directly, however,

---

**34.** Defendants made a similar argument in their earlier motion for judgment on the pleadings, which was denied. *See Pruitt v. Ferruzzi Finanziaria,* No. 89 C 7009 (N.D.Ill. August 4, 1994). As before, Plaintiffs evoke the law-of-the-case doctrine to argue that their common-law fraud claim should not be dismissed. (Pls.' Mem. Opp. at 51–52.) For the same reasons stated earlier, the court does not believe that the law-of-the-case doctrine should bar dismissal of Plaintiffs' fraud claim.

Plaintiffs argue that reliance is "inexorably linked" to the question of materiality; thus, if the omission or misrepresentation were material, then the cause of action should proceed. (Pls.' Mem.Opp. at 53–55.) The court flatly disagrees. Every case cited here lists "a false statement of *material* fact" (or, in certain cases, omission of a material fact) as an element of Illinois common-law fraud, and this element is distinct from that of reliance. Plaintiffs cannot escape the burden of showing reliance merely by asserting that Defendants' alleged omissions or misrepresentations were material. Consequently, Plaintiffs' bald assertions that they would not have acted as they did had they known otherwise is immaterial. (*See* Pls.' Mem.Opp. at 52–53.) They must show reliance *and* materiality, not simply one or the other.

Plaintiffs do present some evidence of actual reliance in the form of affidavits from a few individuals who claim that they actually did rely on Defendants' alleged misstatements. (Pls.' Mem.Opp. at 52, 53.) At best, such evidence goes only to support claims of common-law fraud by these particular individuals; it is wholly inadequate to establish reliance by the entire class. Courts in this district have made clear that "common-law actions for fraud ... require *each* individual to prove that he relied on the alleged misrepresentation." *Good v. Zenith Electronics Corp.*, 751 F.Supp. 1320, 1323 (N.D.Ill.1990) (emphasis added), quoting *Katz v. Comdisco, Inc.* 117 F.R.D. 403, 412 (N.D.Ill.1987). *Good* was a case involving a class action claim for fraud in the securities market. The court noted that a class action would be inappropriate for such a claim because it "would be extremely difficult" to prove reliance on an individual-by-individual basis, as required under Illinois law. 751 F.Supp. at 1323 (granting defendant's motion for summary judgment on fraud claim). Other courts have been similarly unwilling to replace actual reliance with the fraud-on-the-market presumption in securities cases. *See, e.g., In re Information Resources, Inc. Securities Lit.*, No. 89 C 3772, 1994 WL 124890, *2–3, 4–6 (N.D.Ill. April 11, 1994) (requiring actual reliance to show fraud and granting defendant's motion for summary judgment in light of "wholly insufficient" evidence of each

plaintiff's reliance); *Schwartz v. System Software Assocs.*, 813 F.Supp. 1364, 1368 (N.D.Ill.1993) (dismissing common-law fraud claim *sua sponte* and abstaining from determining whether Illinois courts would allow securities fraud plaintiff to substitute fraud-on-the-market theory for proof of actual reliance). The same caution is appropriate here.

Finally, Plaintiffs cite several other cases in support of their theory, such as *Minpeco, S.A. v. ContiCommodity Servs., Inc.*, 552 F.Supp. 327 (S.D.N.Y.1982), *Minpeco S.A. v. Hunt*, 718 F.Supp. 168 (S.D.N.Y.1989), and *United States v. Brown*, 5 F.Supp. 81 (S.D.N.Y.1933), *aff'd* 79 F.2d 321 (2d Cir.), *cert. denied sub nom., McCarthy v. United States*, 296 U.S. 650, 56 S.Ct. 309, 80 L.Ed. 462 (1935). These cases involve New York laws, however, and have nothing to say about Illinois. Similarly, the court is unconvinced by Plaintiffs' attempt to draw an analogy to Rule 10b–5 under the Securities Exchange Act, where a plaintiff's allegations concerning omissions of a material fact creates a rebuttable presumption of reliance. Absent any showing that such a standard has even been applied under Illinois common-law fraud, Plaintiffs are left simply clutching at straws.

■ In sum, the court finds that Plaintiffs cannot rest their common-law fraud claim upon a general "fraud-on-the-market" theory, which is not recognized under the laws of Illinois. Rather, Plaintiffs must be prepared to show actual reliance by each plaintiff in the class. Given that the difficulty of showing actual reliance by each class member may defeat the very purpose for which the class was created, the court recommends that Plaintiffs' common-law fraud claim be dismissed without prejudice so that each individual class member may elect whether to pursue it at his or her will outside this class action.

### CONCLUSION

The court's findings may be summarized as follows. The court recommends that Defendants' motion on Plaintiffs' claim for manipulation of soybean futures market (Count I) be denied because there are genuine issues of material fact regarding each of the major

elements of Defendants' claim—specifically, Defendants' ability to influence prices, the existence of artificial prices, and Defendants' causation of such prices, as well as whether Central Soya had the requisite intent to be held liable for manipulation. In addition to these main elements, there are mixed questions of law and fact regarding the tests that Plaintiffs must employ in order to establish each of these elements. In particular, Plaintiffs' allegation that Defendants manipulated prices through a combination of disinformation and market power, rather than market power alone, raises questions regarding whether or to what degree Plaintiffs must show that Defendants controlled the relevant cash and futures market, not to mention the definition of the relevant market itself. Earlier cases tended to focus solely on the question of market power, thus limiting their precedential value.

With regard to Plaintiffs' claim for excessive speculation (Count II), the court recommends that Defendants' motion be granted. The Commodity Exchange Act does not recognize a private right of action for excessive speculation but leaves violations of the CFTC's speculative limits to administrative enforcement alone. Plaintiffs, therefore, have no standing to bring a separate claim on this issue. The court's earlier denial of Defendants' motion for judgment on the pleadings is not a bar to summary judgment at this point, given that the court did not actually decide this issue—explicitly or implicitly—at that time. Moreover, to the extent that Plaintiffs are arguing that Defendants were not engaged in *bona fide* hedging or violated the speculative limits as part of their scheme to manipulate prices, Plaintiffs' "claim" should be merged with their first claim for price manipulation.

Finally, Defendants' motion for summary judgment on Plaintiffs' fraud claim (Count III) should be granted. As above, the law-of-the-case doctrine does not apply here because the court had not earlier decided this issue on the merits. Also, Plaintiffs' fraud-on-the-market theory is not recognized under Illinois law and thus cannot serve as the basis for a valid claim. Plaintiffs must be prepared to show actual reliance for each

class member, a task that would make the class action extremely unwieldy. Plaintiffs' claim should be dismissed without prejudice, however, so that individual class members may pursue their own claims apart from this action, as they see fit.